RECORD NO. 22-1143

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

# GMS MINE REPAIR,

*Petitioner*,

**v.**

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION; SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION (MSHA),

*Respondents*.

## ON PETITION FOR REVIEW OF A DECISION OF FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

––––––––––––

### PAGE-PROOF BRIEF OF PETITIONER

––––––––––––

James P. McHugh (D.C. Bar No. 56277)
Christopher D. Pence (D.C. Bar No. 53362)
HARDY PENCE, PLLC
10 Hale Street, 4th Floor
Charleston, West Virginia 25301
(304) 345-7250
jmchugh@hardypence.com
cpence@hardypence.com

*Counsel for Petitioner*

## <u>CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), I hereby certify the following:

## I.     Parties

The parties appearing in the administrative proceedings before the Federal Mine Safety and Health Review Commission and this Court are:

1.     GMS Mine Repair, Petitioner ("GMS")

2.     Secretary of Labor, Mine Safety and Health Administration, a Respondent ("Secretary"); and,

3.     Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission"), a Respondent.

No intervenors or amici appeared.

## II.     Ruling Under Review

This matter is before the Court on GMS' petition for review of the May 13, 2022, FMSHRC Decision of Administrative Law Judge John Kent Lewis, in the matter captioned as *Sec'y of Labor, Mine Safety and Health Administration ("MSHA") v. GMS Mine Repair*, Docket No. WEVA 2021-0431, A.C. No. 46-09029-537541 MVK, 44 FMSHRC 399 (May 2022) ("Decision") [JA___]. This Decision became the final Order of the Commission by Notice dated June 22, 2022 [JA___]. In the Decision, the Commission affirmed five citations and associated

penalties, as issued by the Mine Safety and Health Administration, pursuant to 30 U.S.C. 814(a), with associated assessed penalties.

## III.    Related Cases

This case has not previously been before this Court or any other court, and no related cases are currently pending in this Court or any other court.

# **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, GMS Mine Repair is a d/b/a of GMS Mine Repair and Maintenance, Inc., which is a privately owned nongovernmental corporate party. There are no parent corporations of GMS Mine Repair and Maintenance, Inc. d/b/a of GMS Mine Repair. No publicly held company holds 10% or more of GMS Mine Repair and Maintenance, Inc. d/b/a GMS Mine Repair.

GMS Mine Repair and Maintenance, Inc. d/b/a GMS Mine Repair is a mining contractor which provides a broad range of specialized services to mine operators in North America. In this case, GMS Mine Repair was providing independent contractor mining related services at the Mountaineer II Mine, operated by Mingo Logan Coal, LLC and controlled by Arch Resources, Inc.

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES.....................i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT...................................iii

TABLE OF CONTENTS...........................................................................iv

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY OF ABBREVIATIONS AND ACRONYMS ....................................x

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUES.....................................................................2

PERTINENT STATUTES AND REGULATIONS..................................................3

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................................3

INTRODUCTION ..................................................................................3

STATEMENT OF THE CASE.......................................................................5

    I.     Factual Background.....................................................................5

    II.    Procedural History.....................................................................11

          A.    ALJ Decision.............................................................11

          B.    Commission Decision ...............................................13

STANDARD OF REVIEW ..........................................................................14

SUMMARY OF THE ARGUMENT ................................................................15

STANDING ..........................................................................................18

ARGUMENT ...............................................................................19

A.   The Commission erred as a matter of law in failing to apply 30
     C.F.R. § 100.3(c) as it is written, without the need to declare it
     ambiguous .......................................................................19

B.   The Commission erred as a matter of law in declaring 30 C.F.R.
     § 100.3(c) to be ambiguous and granting deference to the
     Secretary's interpretation of 30 C.F.R. § 100.3(c), without
     exhausting all the tools of statutory construction..............................28

C.   The Commission erred as a matter of law in its interpretation of
     30 C.F.R. § 100.3(c) and this conclusion was not "within the
     bounds of reasonable interpretation." .................................................35

D.   The Commission erred by deferring to the Secretary's
     interpretation of 30 C.F.R. § 100.3(c), where the interpretation
     involves a procedural and non-technical issue of a judicial
     nature ..............................................................................40

E.   The ALJ erred when he misinterpreted material facts .......................41

F.   The ALJ erred when he based his decision on his own policy
     pronouncement ................................................................44

CONCLUSION .........................................................................46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Coal Company*,
  40 FMSHRC 1011, 2018 WL 4347355 (2018)................................................9

*American Coal Co. v. FMSHRC*,
  796 F.3d 18 (D.C. Cir. 2015).........................................................14

*Auer v. Robbins*,
  519 U.S. 452 (1997)............................................. 4, 12, 15, 17, 26, 27, 28, 29
                                                        30, 31, 32, 33, 35, 39, 40

*Bowles v. Seminole Rock & Sand Co.*,
  325 U.S. 410 (1945).................................................................19

*Canyon Fuel Co. v. Sec'y of Labor*,
  894 F.3d 1279 (10th Cir. 2018) ....................................................26

*Christensen v. Harris County*,
  529 U.S. 576 (2000)..........................................................16, 19, 33

*CONSOL Pennsylvania Coal Company*,
  39 FMSHRC 1893, 2017 WL 4586223 (2017)............................................33

*Doe Run Company*,
  42 FMSHRC 521, 2020 WL 5096935 (2020)........................................19, 37

*Hobet Mining Co.*,
  26 FMSHRC 890 (Nov. 2004) .......................................................36

*Hoffman v. United States*,
  340 F.2d 645 (U.S. Ct. Cl. 1964)....................................................41

*IO Coal*,
  31 FMSHRC 1346, 20091351 (F.M.S.H.R.C.) (Dec. 2009).........................33

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)...................................... 2, 4, 12, 15, 16, 17, 18, 19, 22,
24, 26, 27, 28, 29, 30, 31, 32,
33, 34, 35, 36, 39, 40, 41

*Martin v. Occupational Safety & Health Review Comm'n*,
499 U.S. 144 (1991)........................................................................45

*Peabody Midwest Mining, LLC*,
41 FMSHRC 409 (July 2019)................................................29, 36

*Peabody Twentymile Mining LLC*,
39 FMSHRC 1323, *aff'd*, 931 F.3d 992 (10th Cir. 2019) ................30, 31, 39

*Prairie State Generating Co, LLC. v. Sec'y of Labor (MSHA)*,
793 F.3d 82 (D.C. Cir. 2015).........................................................15

*Richmond Sand & Stone, LLC*,
41 FMSHRC 402, 2019 WL 4240658 (August 2019) .................................27

*Sec'y of Labor v. Keystone Coal Mining Corp.*,
151 F.3d 1096 (D.C. Cir. 1998)......................................................14

*Sec'y of Labor v. Twentymile Coal Co.*,
456 F.3d 151 (D.C. Cir. 2006).......................................................14

*Sellersburg Stone Co.*,
5 FMSHRC 287 (March 1983), *aff'd*,
736 F.2d 1147 (7th Cir. 1984) .......................................................9

*Shea-S&M Ball v. Massman-Kiewit-Early*,
606 F.2d 1245 (D.C. Cir. 1979)......................................................41

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)................................................................31, 39

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)........................................................................................19

*Windsor Coal Co.*,
    21 FMSHRC 997 (Sept. 1999) ...................................................................33

## STATUTES

30 U.S.C. § 802(d) ..............................................................................................8

30 U.S.C. § 815 ..................................................................................................11

30 U.S.C. § 815(b)(1)(B) .....................................................................................7

30 U.S.C. § 815(d) ...............................................................................................1

30 U.S.C. § 816(a) .............................................................................................18

30 U.S.C. § 816(a)(1)...............................................................................1, 14, 41

30 U.S.C. § 820(a) ...............................................................................................6

30 U.S.C. § 820(i) ................................................................................................8

30 U.S.C. § 823(d) ...............................................................................................1

30 U.S.C. § 823(d)(1)...............................................................................1, 14, 19

30 U.S.C. § 823(d)(2)(A) ...............................................................................1, 14

30 U.S.C. § 823(d)(2)(B) ...............................................................................1, 14

## REGULATIONS

29 C.F.R. § 2700.26 .............................................................................................1

29 C.F.R. § 2700.27 ...........................................................................................44

29 C.F.R. § 2700.67 ...........................................................................................11

29 C.F.R. § 2700.70 ................................................................................1, 14

30 C.F.R. Part 100 ........................................................................................9

30 C.F.R. § 100.3 ................................................................................6, 7, 37

30 C.F.R. § 100.3(a) ....................................................................................36

30 C.F.R. § 100.3(b) ......................................................................................6

30 C.F.R. § 100.3(c)........................................ 2, 3, 4, 5, 6, 8, 9, 10, 11, 12,
                                                13, 15, 17, 18, 19, 20, 21, 22,
                                                23, 24, 25, 27, 28, 31, 33, 34,
                                                35, 37, 38, 39, 41, 44, 45, 46

30 C.F.R. § 100.3(c)(2) ................................................................................22

30 C.F.R. § 100.3(d) ......................................................................................6

30 C.F.R. § 100.3(e) ......................................................................................6

30 C.F.R. § 100.3(f) .......................................................................................7

30 C.F.R. § 100.3(h) ......................................................................................7

30 C.F.R. § 100.7 ...........................................................................................1

30 C.F.R. § 100.7(c)......................................................................................44

## OTHER AUTHORITIES

Criteria and Procedures for Proposed Assessment of Civil Penalties;
Final Rule - Mine Safety and Health Administration,
72 FR 13592 ............................................................... 32, 34, 37, 39, 43, 46

Federal Mine Safety and Health Review Commission Congressional
Budget Justification and Annual Performance Plan for Fiscal Year 2023
https://www.fmshrc.gov/plans/FY2023%2520Justification%2520April.pdf .........42

## GLOSSARY OF ABBREVIATIONS AND ACRONYMS

A                    Appendix

ALJ                  Administrative Law Judge

Commission           Federal Mine Safety and Health Review Commission

Jt. Stip.            Joint Stipulation

GMS Mine Repair GMS

Mine Act             Federal Mine Safety and Health Act of 1977, as amended

MSHA                 Mine Safety and Health Administration ("MSHA"),
                     United States Department of Labor

JA                   Joint Appendix

Secretary            Secretary of Labor, United States Department of Labor

## JURISDICTIONAL STATEMENT

The Federal Mine Safety and Health Review Commission previously had jurisdiction over this case because GMS timely contested the citations and proposed assessments it received from the Mine Safety and Health Administration, pursuant to 30 U.S.C. § 815(d), 30 U.S.C. § 823(d), 30 C.F.R. § 100.7 and 29 C.F.R. § 2700.26.

An ALJ issued the Decision in this matter on May 13, 2022, captioned; *Sec'y of Labor, Mine Safety and Health Administration ("MSHA") v. GMS Mine Repair*, Docket No. WEVA 2021-0431, A.C. No. 46-09029-537541 MVK, 44 FMSHRC 399 (May 2022) ("Decision") [JA___]. Thereafter, on June 13, 2022, GMS petitioned the Commission for discretionary review, pursuant to 30 U.S.C. § 823(d)(2)(A) and 29 C.F.R. § 2700.70. [JA___]. The Commission refused to grant GMS's request for discretionary review by Notice dated June 22, 2022, informing the parties that no two Commissioners voted to grant the petition or to otherwise order review under 30 U.S.C. § 823(d)(2)(B). [JA___]. In the Notice, the Commission notified the parties that the Decision would become the final Order of the Commission effective June 22, 2022 (40 days after the May 13, 2022, Decision), pursuant to 30 U.S.C. § 823(d)(1).

GMS timely filed a petition for review with this court on June 30, 2022, pursuant to Section 106(a)(1) of the Mine Act, 30 U.S.C. § 816(a)(1), within 30 days

of when the Decision became the final Order of the Commission. Accordingly, this

Court has jurisdiction over this matter.

## STATEMENT OF THE ISSUES

The issues presented in this case are:

A.  Whether the Commission erred by failing to apply the plain and unambiguous language of 30 C.F.R. § 100.3(c), such that the relevant penalty history of a contractor includes only those violations which occur and become final during the 15-month history lookback period of 30 C.F.R. § 100.3(c).

B.  Whether the Commission erred by failing to exhaust all the traditional tools of regulatory construction, as required by *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), prior to declaring 30 C.F.R. § 100.3(c) to be ambiguous and deferring to the Secretary's interpretation of the regulation.

C.  Whether the Commission's decision to grant deference to the Secretary's position - that citations issued outside the 15-month period preceding the citations at issue may be considered for purposes of determining a contractor's history - is "within the bounds of reasonable interpretation," as required by *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

D.  Whether the Commission erred by deferring to the Secretary's interpretation of 30 C.F.R. § 100.3(c), where the interpretation involves a procedural and non-technical issue of a judicial nature.

E.  Whether the Commission misinterpreted material facts.

F.  Whether the Commission erred when basing its decision on its own policy pronouncement that GMS's position would lead to "perverse incentive for operators to simply contest every citation and order." Decision, p. 6 [JA ___].

## PERTINENT STATUTES AND REGULATIONS

The texts of pertinent statutes and regulations are set forth in the addendum at the end of this brief.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

GMS respectfully requests oral argument. This case presents significant legal issues that will affect GMS and other independent contractors and operators. GMS believes that oral argument would be of value to the Court since the issues involve the extent of deference to an administrative agency's interpretation of its regulations.

## INTRODUCTION

In this case, the Commission was called upon to decide the appropriateness of the Secretary's proposed interpretation of 30 C.F.R. § 100.3(c) ("History of Previous Violations").[1] The Commission declared the regulation ambiguous and adopted the Secretary's proposed interpretation. Decision, p. 5 [JA___]. GMS now appeals to this Court and asserts that the Commission should have rejected the Secretary's

---

[1] 30 C.F.R. § 100.3(c) provides:

(c) History of previous violations. An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history. The repeat aspect of the history criterion in paragraph (c)(2) of this section applies only after an operator has received 10 violations or an independent contractor operator has received 6 violations.

3

interpretation of 30 C.F.R. § 100.3(c) and should have followed Supreme Court precedent setting forth the method for interpreting regulations, as set forth in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

This appeal also deals with the analytical procedure which the Commission used when evaluating the meaning of 30 C.F.R. § 100.3(c). Specifically, at the request of the Secretary, the Commission agreed to count citations that were issued to GMS prior to the 15-month lookback period set forth in 30 C.F.R. § 100.3(c) in GMS's violation history, if the citation became final during that 15-month period. This caused the penalties at issue to be approximately twice what they should be. *Decision*, pp. 1, 6 [JA___]. In the process, the Commission adopted the Secretary's interpretation and application of 30 C.F.R. § 100.3(c).

This case also calls upon the Court to resolve substantial issues of law related to the principles and prerequisites for a court's deference to MSHA's interpretation of its regulations pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997) ("*Auer*") and *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ("*Kisor*"). The context for this dispute is MSHA's calculation of GMS's history of prior violations pursuant to 30 C.F.R. § 100.3(c).

The issues before the Commission were well-framed below because the parties stipulated to all relevant facts. All stipulated facts are reproduced verbatim on pages 1-3 of the Decision [JA___]. In summary, GMS agreed to accept the fact

of violation, gravity and negligence for all five citations in the Docket but did not agree to accept the overall penalties, contending that the Secretary had misapplied 30 C.F.R. § 100.3(c) in assessing its prior history of violations. This simple misapplication of 30 C.F.R. § 100.3(c) resulted in proposed penalties that were more than 50% higher than they should be if the regulation was properly applied. GMS contends that the ALJ erred as a matter of law when approving the Secretary's interpretation of 30 C.F.R. § 100.3(c) and applying it to the stipulated facts.

Without judicial oversight related to this interpretation, the Secretary will continue to misapply the penalty regulation for GMS and other contractors and will, as a result, require all contractors and operators to pay higher penalties than required by law.

## STATEMENT OF THE CASE

### I.    Factual Background

GMS is a company which, among other work, performs a wide variety of contract services at various mine sites. Decision, p. 1; Stip. No. 4 [JA___]. In the course of its business, GMS was performing contract work for the operator at Mingo Logan Coal LLC's Mountaineer II Mine in Logan West Virginia, on April 20 and 27, 2021, the dates on which the five citations at issue in this proceeding were issued. Decision, p. 1, Stip. No. 5 [JA___].

After issuance of the citations, the Secretary proposed that GMS be assessed a total penalty of $7,331 for the five citations. Decision, p. 2, Stip. No. 8 [JA___]. The Secretary's penalty calculations for independent contractors such as GMS, pursuant to 30 U.S.C. § 820(a) and 30 C.F.R. § 100.3 consider several criteria, including:

• Annual hours worked by the contractor at all mines (30 C.F.R. § 100.3(b));

• *History of independent contractor's previous violations across all mines* during the designated 15-month period (30 C.F.R. § 100.3(c));

• History of independent contractor's previous violations of the same standard across all mines during the designated 15-month period (30 C.F.R. § 100.3(c));

• Negligence (30 C.F.R. § 100.3(d));

• Likelihood of the occurrence of the event against which a standard is directed (30 C.F.R. § 100.3(e));

• Severity of the illness or injury if the event has occurred or was to occur (30 C.F.R. § 100.3(e)); and,

• The number of persons potentially affected if the event has occurred or were to occur (30 C.F.R. § 100.3(e)).

6

These various criteria were developed by the Secretary pursuant to notice and comment rulemaking and 30 U.S.C. § 815(b)(1)(B).[2] The level of each penalty criterion is determined either by the Secretary (criteria 1-3 above) or MSHA's Inspector (criteria 4-7 above). The level assigned by the Secretary or the MSHA Inspector corresponds directly to a specific number of penalty points set forth in the various subsections and tables in section 30 C.F.R. § 100.3 "Determination of penalty amount; regular assessment." The sum of the points for each criterion then corresponds to a total financial penalty for a given citation, although this total amount may be reduced for 10%, by the demonstrated good faith of the independent contractor in abating a violation. 30 C.F.R. § 100.3(f). The penalty amount may also be reduced by a showing that the penalty amount may affect the operator's ability to continue in business. 30 C.F.R. § 100.3(h).

---

[2] 30 U.S.C. § 815(b)(1)(B) provides:

> (B) In determining whether to propose a penalty to be assessed under section 820(b) of this title, the Secretary shall consider the operator's *history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation.* (emphasis added).

These criteria are also reproduced verbatim in 30 U.S.C. § 820(i) as factors the Commission/ALJ shall consider in assessing monetary penalties.[3] In the instant case, GMS contests a single penalty criterion in the penalty point calculation-the history of an independent contractor's previous violations across all mines under 30 C.F.R. § 100.3(c).

For a brief background, 30 C.F.R. § 100.3(c) is applicable to operators and contractors.[4] 30 C.F.R. § 100.3(c) specifically includes a 15-month lookback period to determine a mining contractor's history of prior violations. This 15-month lookback period for History of Previous Violations is a mathematical calculation which correlates a contractor's history of violations directly to points and a resulting penalty, using Table VII ("Independent Contractor's Overall History of Number of

---

[3] 30 U.S.C. § 820(i) provides:

(i)     Authority to assess civil penalties

The Commission shall have authority to assess all civil penalties provided in this chapter. In assessing civil monetary penalties, the Commission shall consider the operator's *history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation.* (emphasis added).

[4] Pursuant to 30 U.S.C. § 802(d), a "contractor," like GMS, is deemed an operator "when performing services or construction at such mine." *Id.*

8

Violations") and Table IX ("History of Previous Violations-Repeat Violations for Independent Contractors") set forth in 100 C.F.R. § 100.3(c).

By applying the Tables, the Secretary uses 100 C.F.R. § 100.3(c) to determine a mining contractor's initial assessed penalty. The ALJ, in turn, relies on the Secretary's assessed penalty as a starting point for making his determination of the appropriate penalty in a contested administrative case. The ALJ may deviate from the Secretary's proposed assessment, since facts may be developed during a contested administrative hearing that warrant a change in the penalty. In order to deviate from this assessed penalty, the Commission has repeatedly held that the ALJ must explain why a deviation from the Secretary's proposed assessment is appropriate.[5]

In this case, the Secretary interprets 30 C.F.R. § 100.3(c) to mean that the calculation of "previous violations at all mines" includes *citations which were issued prior to the 15-month lookback period* described in 30 C.F.R. § 100.3(c) *if the*

---

[5] In *American Coal Company*, 40 FMSHRC 1011, 1015, 2018 WL 4347355, at *3, the Commission held that "Commission judges are not bound by the Secretary's penalty regulations set forth at 30 C.F.R. Part 100…." However, the Commission also held that ALJs must explain any substantial divergence from the penalty proposal of the Secretary. *Id.* at 1015 and 1025 (*citing Sellersburg Stone Co*., 5 FMSHRC 287, 290-4 (March 1983), aff'd, 736 F.2d 1147 (7th Cir. 1984)). Of course, for this rule to be effectively implemented, the Secretary's penalty proposal must first be properly calculated. If, as here, the Secretary's proposed penalty is not properly calculated, then an ALJ's explanation of any potential divergence from the proposed penalty would be based on an erroneous and inaccurate starting point.

*citation becomes final within the 15-month lookback period.* Decision, p. 3, Stip. 21 [JA___]. The Secretary's incorrect interpretation of 30 C.F.R. § 100.3(c) resulted in 16 prior citations, or 11 points being counted as the "history" for four of the citations issued to GMS and 15 prior citations, or 10 points being counted as the "history" for the last citation issued to GMS. Decision, p. 3, Stip. No. 23 [JA___]. Repeat violations were not an issue here. Under the Secretary's approach, the assessed penalty for all citations was $7,331.

Conversely, GMS contends that the 15-month lookback period in 30 C.F.R. § 100.3(c) means what it plainly states and includes *only those violations where citations were both issued and became final* in the 15-month lookback period. Decision, p. 3, Stip. No. 23 [JA___]. If GMS is correct, the parties agree that there would be 0 prior violations in the 15-month lookback period in this case. Decision, p. 3, Stip. No. 24 [JA___]. If 30 C.F.R. § 100.3(c) is interpreted as GMS contends, the total assessed penalty for all citations would be $3,268. Decision, p. 3, Stip. No. 25 [JA___].

Of course, the interpretation of 30 C.F.R. § 100.3(c) in this case will affect future citations for all operators and contractors and this is an issue of first impression for the Court.

## II.    Procedural History

### A.    ALJ Decision.

In response to the issuance of Citations Nos. 9298012, 9298013, 9298015 and 9298016 and 9293663, and the promulgation of a proposed assessment for these Citations, GMS contested the citations and the Secretary's proposed assessments pursuant to Section 105 of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 815. The sole basis for GMS' contest was the manner in which the Secretary had assessed GMS's "History of Previous Violations" pursuant to 30 C.F.R. § 100.3(c).

Since the dispute between the parties related solely to a legal issue, the Secretary and GMS agreed to a set of stipulations clarifying the dispute and then submitted opposing motions for summary decision to the ALJ pursuant to 29 C.F.R. § 2700.67. Decision, pp. 1-3 [JA___]. As the stipulations indicate, none of the underlying facts giving rise to the citations were disputed. Rather, GMS contested the proposed assessments, contending that the history of previous violations attributed to GMS was erroneous.

On May 13, 2022, the Commission ALJ denied Respondent's Motion for Summary Decision and granted the Secretary's Motion for Summary Decision. *Sec'y of Labor, Mine Safety and Health Administration ("MSHA") v. GMS Mine*

*Repair*, Docket No. WEVA 2021-0431, A.C. No. 46-09029-537541 MVK, 44 FMSHRC 399 (May 2022) ("Decision") [JA___].

In the ALJ Decision, the Court declared 30 C.F.R. § 100.3(c) to be ambiguous "on its face" (Decision, p. 5 [JA___]) and adopted the Secretary's interpretation of its regulation and rejected GMS' reading of the regulation. In this regard, the ALJ held that 30 C.F.R. § 100.3(c) "can be read to support either party's position." Decision, p. 5 [JA, ___].

A fundamental problem with the Decision is that the ALJ's Decision is contrary to the text of MSHA's own regulation. Further, the ALJ declared summarily, without the necessary analysis required by *Auer* and *Kisor*, that 30 C.F.R. § 100.3(c) is ambiguous. Based on the ALJ's conclusion of ambiguity, the ALJ adopted the Secretary's proposed interpretation of 30 C.F.R. § 100.3(c) and allowed citations that were issued for violations prior to the 15-month lookback period to be included in the operator's violation history, provided that such citation became final during the 15-month period. Decision, pp. 1, 6 [JA___]. GMS further contends that the ALJ's Decision is contrary to well-established rules of regulatory construction.

Finally, the ALJ based his decision on inaccurate assumptions and facts. For example, the ALJ adopted a finding of fact that is materially different from the stipulated facts when he held that "There is no disagreement that citations and orders

12

that have become final in the 15-month period are included." Decision, p. 5 [JA___].

GMS certainly never agreed that "**all** citations and orders that have become final in

the 15-month period are included." Rather, GMS's position was that only violations

which are issued and become final (i.e., which are paid, adjudicated or become final

orders) within the preceding 15 months are included in the calculation of a

contractor's history of previous violations.

The ALJ also assumed, without any evidence in the record, that "[u]nder the

Respondent's interpretation of the regulation, most (if not all) violations would not

be considered in the penalty assessment." Decision, p. 6 [JA___]. There was no

evidence of this in the Stipulations and the ALJ did not take any evidence on this

point.

Finally, the ALJ also assumed, without supporting evidence, that GMS's

interpretation of the 30 C.F.R. § 100.3(c) would "lead to the perverse incentive for

operators to simply contest every citation until the expiration of 15 months as a way

of lowering assessed penalties." Decision, p. 6 [JA___]. This is an impermissible

policy statement and there was no evidence to support this statement. It undoubtedly

affected the ALJ's interpretation of the regulation.

**B.    Commission Decision**

Subsequent to the Decision, GMS then submitted a Petition for Discretionary Review to the Commission pursuant to 30 U.S.C. § 823(d)(2)(A) and 29 C.F.R. § 2700.70. The Commission refused to grant this request by Notice dated June 22, 2022, informing the parties that no two Commissioners voted to grant the petition or to otherwise order review under 30 U.S.C. § 823(d)(2)(B). [JA___]. Upon the Commission's refusal to grant Discretionary Review, the ALJ Decision effectively became the final Commission Decision in this case pursuant to 30 U.S.C. § 823(d)(1). GMS then filed this appeal pursuant to Section 106(a)(1) of the Mine Act, 30 U.S.C. § 816(a)(1).

<u>**STANDARD OF REVIEW**</u>

This Court reviews the Commission's legal conclusions *de novo*. *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006); *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096 (D.C. Cir. 1998). Here, the parties stipulated to the material facts. Jt. Stip. [JA___]. To the extent that the Court made factual findings not consistent with the stipulations, the Mine Act directs that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 30 U.S.C. § 816(a)(1); *American Coal Co. v. FMSHRC*, 796 F.3d 18, 23 (D.C. Cir. 2015) ("We review the Commission's finding of fact for substantial evidence");

14

*Prairie State Generating Co, LLC. v. Sec'y of Labor (MSHA)*, 793 F.3d 82, 89 (D.C. Cir. 2015). To the contrary, if factual determinations are not supported by the substantial evidence, they are not conclusive.

## SUMMARY OF THE ARGUMENT

In this case, GMS contends that the ALJ wrongly interpreted the plain language of 30 C.F.R. § 100.3(c). In *Kisor*, the Supreme Court held "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means--and the court must give it effect, as the court would any law." 139 S. Ct. at 2415. The *Kisor* Court also added that "before concluding that a rule is genuinely ambiguous, a court must exhaust all the "traditional tools" of construction." *Id*. These tools include the "text, structure, history and purpose of a regulation." *Id*. The Court reasoned that "Doing so will resolve many seeming ambiguities out of the box, without resort to *Auer* deference." *Id.*

In this case, the ALJ summarily declared 30 C.F.R. § 100.3(c) to be ambiguous, and then applied the Secretary's reading of the regulation without undertaking the necessary analytical steps required by *Kisor*. Because of the breadth of *Auer* deference, a finding of "ambiguity" by a reviewing court almost always allows an agency to interpret its own regulations however it deems appropriate, notwithstanding that the agency could have written the regulation in accordance with its "interpretation" during the notice and comment process and failed to do so. This

15

procedure effectively allows an agency to "create de facto a new regulation." *Id.*, (*citing Christensen v. Harris County*, 529 U.S. 576, 588 (2000)) Such an approach deprives the regulated community of the checks and balances which come from the rulemaking process.

To avoid such an arbitrary and unpredictable application of agency regulations, the *Kisor* Court developed an analytical template requiring a multi-step process. Initially, a court must endeavor to apply a regulation as written. Next, for added protection against the arbitrary and changing application of regulations, the *Kisor* template includes two additional steps. First, the analytical template requires a reviewing court to "exhaust" the rules of regulatory construction before declaring a regulation ambiguous. Second, the analytical template requires the ALJ to make a determination as to whether the agency's interpretation was "within the bounds of reasonable interpretation." Both of these additional reasonable steps include sub-steps, discussed below, which help guide the judicial review of a regulatory interpretation and prevent an agency from amending its own regulations or applying the regulations in an arbitrary and changing fashion, without undergoing additional notice and comment rulemaking.

The ALJ here simply did not follow the *Kisor* analytical template. At the outset, there was no effort to apply the regulation as it is written. Rather the ALJ summarily jumped to ambiguity. Second, if the ALJ had applied the additional two

steps of "exhausting" the rules of construction and seeking to determine if the Secretary's interpretation was reasonable when held up to the regulation, the result here would have been different. Instead of the 15-month history lookback period of 30 C.F.R. § 100.3(c) including citations for violations that occurred long before the 15-months even began, as requested by the Secretary, the lookback period would only have included citations for violations within the 15-month lookback period that became final. Here, the Secretary is not applying its own regulation as it was written.

There is another very good reason for a reviewing court to exercise its own analysis of the regulation, rather than the self-serving position of the Secretary. The determination of how the 15-month lookback period is applied has nothing to do with the Secretary's technical expertise-mine safety. Rather, the application of a 15-month lookback period is a purely procedural issue. Courts deal with procedural issues far more than executive agencies. This is one "circumstance" where the reasoning in *Auer*, for deferring to a regulatory agency, simply disappears. *Kisor*, 139 S. Ct. at 2414.

Also, in the Decision, the ALJ makes assumptions which are wholly unsupported by any evidence in the record. For example, the ALJ stated: "[u]nder the Respondent's interpretation of the regulation, most (if not all) violations would not be considered in the penalty assessment." Decision, p. 6 [JA____]. There was no evidence to support this statement.

17

In this case, the ALJ's decision was also clouded by his unsupported policy statement that GMS's position would lead to "perverse incentive for operators to simply contest every citation and order." Decision, p. 6 [JA ___]. The lookback period should not be artificially extended simply because the reviewing judge thinks that 15 months is too short a period of time for the look-back period to achieve its aim. Moreover, the agency's public information indicates that this "assumption" is unfounded and unnecessary in any event.

In the end, the interpretive template of *Kisor* is particularly important because, through a rigorous analytical process, it prevents inappropriate and unnecessary deference to an unsupportable agency position. This, in turn, prevents the arbitrary application of the law and prevents rulemaking without the protections of the notice and comment requirements. Finally, for GMS in this case, it has the practical impact of preventing penalties which are double what they should be if 30 C.F.R. § 100.3(c) is simply applied, as written.

## **STANDING**

GMS has standing to seek review under section 106(a) of the Mine Act. 30 U.S.C. § 816(a); see D.C. Cir. R. 28(a)(7). Section 106(a) authorizes "any person adversely affected or aggrieved by an order of the Commission" to seek review of any final Commission order in this Court. 30 U.S.C. § 816(a). GMS was adversely affected and aggrieved by Decision of the ALJ, which became the Commission's

final order, pursuant to 30 U.S.C. § 823(d)(1), because the ALJ inappropriately applied 30 C.F.R. § 100.3(c), misinterpreted GMS's history of previous violations and requires GMS Mine Repair to pay penalties that are more than twice what the penalties should be by regulation. This adversely affects GMS in this and subsequent cases.

## **ARGUMENT**

**A.    The Commission erred as a matter of law in failing to apply 30 C.F.R. § 100.3(c) as it is written, without the need to declare it ambiguous.**

The ALJ committed legal error by disregarding the clear language of 30 C.F.R. § 100.3(c). This is apparent from the "text and structure" of the regulation. In *Doe Run Company*, 42 FMSHRC 521, 529, 2020 WL 5096935, at *6, the Commission noted that "[t]he cardinal principle of interpretation is to give effect, *if possible*, to every clause or word." (*citing TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (emphasis added). In *Kisor*, the Supreme Court explained it like this:

> If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law….if the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense. Deference in that circumstance would "permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation."

*Kisor*, 139 S. Ct. at 2415. See also, *Christensen v. Harris County*, 529 U.S. 576, 588 (2000); *Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410, 414 (1945).

30 C.F.R. § 100.3(c) provides:

>    (c)    *History of previous violations.* An operator's history of previous violations is based on both ***the total number of violations*** and the number of repeat violations of the same citable provision of a standard ***in a preceding 15-month period***. **Only assessed violations that have been *paid or finally adjudicated, or have become final orders* of the Commission will be included in determining an operator's history**. The repeat aspect of the history criterion in paragraph (c)(2) of this section applies only after an operator has received 10 violations or an independent contractor operator has received 6 violations.
>
>    (1)    Total number of violations. For mine operators, penalty points are assigned on the basis of the number of violations per inspection day (VPID) (Table VI). Penalty points are not assigned for mines with fewer than 10 violations in the specified history period. **For independent contractors, penalty points are assigned on the basis of the total number of violations at all mines (Table VII).** This aspect of the history criterion accounts for a maximum of 25 penalty points.
>
>    (2)    Repeat violations of the same standard. Repeat violation history is based on the number of violations of the same citable provision of a standard **in a preceding 15-month period**. For coal and metal and nonmetal mine operators with a minimum of six repeat violations, penalty points are assigned on the basis of the number of repeat violations per inspection day (RPID) (Table VIII). For independent contractors, penalty points are assigned on the basis of the number of violations at all mines (Table IX). This aspect of the history criterion accounts for a maximum of 20 penalty points (Table VIII).

30 C.F.R. § 100.3(c) (emphasis added).

A simple reading of 30 C.F.R. § 100.3(c) demonstrates that the standard is designed to enable anyone to easily calculate the "history of previous violations" (and repeat history) using clear and unambiguous terms and a straight-forward 3-step process as follow:

20

### Step One: History of Violations in the Preceding 15 months:

An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period.

30 C.F.R. § 100.3(c).

In step one, the regulation considers the date of the citation at issue and then counts the total number of violations issued in the preceding 15-month period. The language is clear and only refers to violations in the preceding 15 months. There is no reference to violations *before* the 15 months as the Secretary asserted. The sentence can only have one meaning. This meaning is not consistent with the Secretary's proposed interpretation. Any citations issued more than 15 months prior to the citation in dispute will not count because, under this clear standard, only the citations issued in the preceding 15 months are part of the universe of relevant citations in this first step of the process.

### Step 2: The Due Process Step:

Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history.

30 C.F.R. § 100.3(c).

Step two is the due process step. The drafters determined it would not be fair to use all "issued" violations against an operator to enhance the penalty because some violations may get modified or vacated through contested proceedings.

21

However, if the violation is paid or adjudicated, then it satisfies due process and it is therefore fair to use the violation to enhance the penalty against the operator/contractor. So, in Step 2, the total number of violations from Step 1 is reduced by the removal of any that have not been paid and are not final (through the adjudication process). At this point, Table VIII of 30 C.F.R. § 100.3(c) is applied and the contractor is assessed a given number of points which correlates directly to a total monetary penalty (after the points in other categories not at issue here are combined with the points from this category).

Then, if the contractor has repeat violations of the same standards within the 15-month lookback period, the repeat history table (Table IX) is applied.

### Step 3 Repeat Violations of the Same Standard:

The repeat aspect of the history criterion in paragraph (c)(2) of this section applies only after an operator has received 10 violations or an independent contractor operator has received 6 violations.

….Repeat violation history is based on the number of violations of the same citable provision of a standard in a preceding 15-month period.

30 C.F.R. §§ 100.3(c) and (c)(2).

In Step 3, the violations resulting from Step 2 are reviewed for repeat violations of the same legal standard and the operator/contractor may receive additional penalty points.  In this step, a contractor/operator is not charged with a repeat history enhancement unless they have the requisite number of repeat violations of the same citable provision in the same standard in the preceding 15-

month period. While this step is not at issue here, it is relevant to the *Kisor* mandated tools of regulatory construction because it clearly shows that 30 C.F.R. § 100.3(c) sets up a step-by-step process for easily determining a contractor's/operator's history of prior violations.  If there are the requisite number of repeat violations of the same standard, the RPID or independent contractor points table in subsection (2) is applied.

In this case, the ALJ did not fully analyze the text and surrounding structure of 30 C.F.R. § 100.3(c), including the clear, step-by-step directives of each clause and subsection contained in the standard. Rather, the ALJ summarily found the regulation to be ambiguous and, in turn, approved the Secretary's interpretation.

Of course, 30 C.F.R. § 100.3(c) can be applied as it is written, if the Secretary only counts the "violations" issued in the preceding 15 months and then excludes those not paid, adjudicated or the subject of a final order. Under a clear reading of the regulation, the words "violations in the preceding 15 months" simply cannot be construed to include "violations occurring prior to the 15-month period," as alleged by the Secretary. There is no ambiguity here.

The regulation clearly and unambiguously sets forth the way "history of previous violations" is calculated. Starting with the obvious, a violation does not become a "violation" for purposes of this regulation until a citation is issued. The regulation then clearly states that "violations" which count in the "history of

23

previous violations" determination include only those violations which have been issued and become "final" (i.e., through payment or adjudication) within the preceding 15-month period. To be included in an operator's history, a citation for a violation must 1) be issued *in the preceding 15-month period*, and 2) be paid, finally adjudicated, or have become a final order of the Commission in the preceding 15-month period.

The 15-month lookback period is the only relevant period of time mentioned in the regulation. Nowhere does the regulation state that citations which are issued before the 15-month lookback period, that just happen to become final within the 15-month lookback period are to be counted. The regulation uses the words "violations…***in*** a preceding 15-month period" not "violations…[outside] a preceding 15-month period [that become final in the 15-month period]"

Contrary to the admonitions of *Kisor*, the Secretary seeks deference to effectuate a change in the plain meaning of a clear regulation because the Secretary's interpretation is not supported by the plain and unambiguous language of the regulation with the practical effect that the penalties in this case are more than double what they should be.  While the Secretary may want 30 C.F.R. § 100.3(c) to be ambiguous so that he can alter its meaning, the appropriate way to do this is through notice and comment rulemaking.

The regulation does not say, as asserted by MSHA, that violations issued outside the 15-month lookback period, "regardless of when issued," may be included in the history. Decision, p. 5 [JA___]. The ALJ wrongly concludes that the "the regulation…can be read to support either party's position." *Id.* Rather, the Secretary's interpretation requires reading things into the regulation that are not there.

The ALJ's shorthand basis to declare an ambiguity is not consistent with the more stringent requirements outlined in *Kisor*, that must be met before a regulation is deemed ambiguous, including the need to exhaust the rules of regulatory construction and the need to explain how the Secretary's interpretation is reasonable. 139 S. Ct. at 2415. The ALJ never demonstrated or attempted to demonstrate where the regulation refers to historical violations before the 15-month period.

If taken to its logical extreme, the Secretary's interpretation and the ALJ's Decision would lead to very old citations, which were delayed for some reason in the litigation process, and are not recent enough in time to merit their inclusion to enhance a penalty, to be mixed with the recent history. For instance, what if you have a citation that is issued in 2018, the operator has a hearing in 2019, the ALJ decides the issue in favor of the operator and the Secretary appeals, the Commission remands the case for further hearing and findings in 2020 and the violation is settled by the parties in 2021.  Does that 2018 violation count toward a citation issued in

2022? The Secretary would say yes. The clear terms of the standard and GMS would say no. That does not further the purpose of what the regulation hoped to achieve, presumably a scale of increasing penalties to discourage repeat violators, but not forever, only for a defined window of time. Such an interpretation effectively destroys the recent history snapshot that MSHA promulgated in the 15-month lookback period of 30 C.F.R. § 100.3(c).

The only attempt by the ALJ to parse out the terms of the regulation is where he states:

> Based on the language of the regulation, it is unclear if the second sentence is intended to limit the violations mentioned in the first sentence to those that were issued and finalized in the preceding 15-month period, or if it is intended to clarify that the 15-month period is only in reference to the finalization date. Both competing interpretations are reasonable.

Decision, p. 5 [JA____].

This is not the type of detailed textual and contextual analysis of a regulation anticipated by *Auer* and *Kisor*. In *Kisor*, Justice Kagan, writing for the majority held:

> If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means--and the court must give it effect, as the court would any law.

139 S. Ct. at 2415.

Nor is this a case where both parties advanced *plausible* interpretations of the regulation's plain language in a manner that an ambiguity is created. *See*, *Canyon Fuel Co. v. Sec'y of Labor*, 894 F.3d 1279, 1290 (10th Cir. 2018).

26

The Secretary cannot rightfully fall back on some sort of deferential interpretation of the regulatory language if there is no ambiguity in the first place. That is akin to "bootstrapping." In *Kisor*----there must first be an attempt by the court to apply the regulation as it is written using all rules of construction. Only then does ambiguity potentially come into play. 139 S. Ct. at 2415. Similarly, in *Richmond Sand & Stone, LLC*, 41 FMSHRC 402, 403–04, 2019 WL 4240658, at *2 (August 2019), the Commission held that "questions of deference [to the Secretary's interpretation] do not arise unless the regulation is determined to be genuinely ambiguous after all the traditional tools of construction are exhausted. (*citing*, *Kisor*, 139 S. Ct. 2400, 2415-19 (2019)). Here, the relevant regulatory language is clear and unambiguous and can be applied as written.

Since the ALJ did not determine if the regulation could be applied as written, he has committed an error of law which is contrary to *Auer* and *Kisor*.  Since this is a de novo question of law, the Court should simply apply 30 C.F.R. § 100.3(c) as it is written. Using the 3-step process listed above, only violations issued and final *in* the 15-month lookback period may be considered for history. In this case, the stipulated evidence is clear that this results in a "history of past violations" for GMS of 0 for all citations in the Dockets and the penalty should be reduced to $3,268.

**B.    The Commission erred as a matter of law in declaring 30 C.F.R. § 100.3(c) to be ambiguous and granting deference to the Secretary's interpretation of 30 C.F.R. § 100.3(c), without exhausting all the tools of statutory construction.**

"Ambiguity" has been a well-worn path for executive agencies to interpret the regulations they wrote. To limit the overuse of deference, the Court in *Kisor* held that "a court should not afford *Auer* deference unless, after exhausting *all* the 'traditional tools' of construction…the regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2405.  After *Kisor*, it is clear that declaring a regulation to be ambiguous should be a last resort, rather than a default. To get to this last resort, an ALJ is obligated to follow the guidelines of *Kisor.* This recent decision of the Supreme Court was not discussed in the ALJ's Decision. GMS identified this deficiency to the Commission in its Petition for Discretionary Review, yet the Commission likewise failed to reconcile the Decision with *Kisor*.

The Supreme Court explained the requirement as follows:

> before concluding that a rule is genuinely ambiguous, a court must exhaust all the "traditional tools" of construction….For again, only when that legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude that it is "more [one] of policy than of law…." That means a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved….(A regulation is not ambiguous merely because "discerning the only possible interpretation requires a taxing inquiry"). To make that effort, a court must "carefully consider" the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency

28

> to fall back on. Ibid. Doing so will resolve many seeming ambiguities
> out of the box, without resort to *Auer* deference.

*Kisor*, 139 S. Ct. at 2415 (citations omitted)

Here, rather than exhausting the "traditional tools" of construction (text, structure, history, and purpose of a regulation), as noted, the ALJ "waived the ambiguity flag" and started with the proposition that 30 C.F.R. § 100.3(c) is ambiguous. Decision, p. 5 [JA____]. While such summary declarations may have once been the norm, so that the executive agency who wrote the regulation in the first instance could also interpret its own regulation, they are clearly prohibited now. In *Kisor*, the Supreme Court held: "*Auer*…gives agencies their due, while also allowing—indeed, obligating—courts to perform their reviewing and restraining functions." *Kisor*, 139 S. Ct. at 2415

Another Commission ALJ has recognized that *Kisor* requires a court to refrain from declaring an ambiguity until it has considered if the regulation can be applied as written and it has exhausted all traditional tools of construction. *Peabody Midwest Mining, LLC*, 41 FMSHRC 409, 427 (July 2019) (ALJ). In this regard, the ALJ acknowledged that a court "cannot wave the ambiguity flag" prematurely because the regulation is merely difficult to understand and applied the analytical template of *Kisor*, eventually concluding that the Secretary's interpretation was "unreasonable" and refusing to defer to the Secretary. *Id.* at pp. 427-442.

29

Here, the analysis of an ALJ must follow the guidelines of *Kisor*:

- Apply the regulation as written if possible.

- If there is hesitation, analyze the regulation using all "tools of construction" to include the text, structure, history, and purpose of a regulation.

- After using all tools of construction, if the regulation is genuinely ambiguous, then the ALJ must determine if MSHA's reading of the regulation is:

  o  reasonable,

  o  consistent with the regulations,

  o  represents the agency's reasoned and authoritative judgment, and,

  o  falls within the agency's expertise.

*Kisor*, 139 S. Ct. at 2415-19.

In *Peabody Twentymile Mining LLC*, 39 FMSHRC 1323, aff'd, 931 F.3d 992 (10th Cir. 2019), although the Commission could not agree on a result, the Commissioners discussed, in separate opinions, the importance of an ALJ's analysis of the *Auer* limiting factors when an executive agency seeks deference to an

30

interpretation of a regulation it drafted. *Id*. at 1330, 1344, 1352.[6] The Commissioners in *Peabody* listed some of the limitations to *Auer* deference:

- "if the interpretation offered was 'plainly erroneous or inconsistent with the regulation.'

- "when an agency's interpretation does not 'reflect the agency's fair and considered judgment.'"

*Id.* at 1330.
- *Auer* deference does not extend to the interpretation of a regulatory preamble.

*Id.* at 1352.

Here, the ALJ failed to fully analyze the text and structure of the regulation as contemplated by either *Auer* or *Kisor*, before resorting to ambiguity. Nor did the ALJ analyze the reasonableness of the agency's interpretation when compared to the terms of the regulation. Of course, the ALJ did briefly discuss a portion of the history of the regulation-the Preamble. But the regulation was amended and reworked in

---

[6] The Commissioners in *Peabody Twentymile* also discussed the potential for residual persuasive deference to agency pronouncements under *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944) related to the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade" but only one Commissioner would have granted deference under that authority. *Peabody Twentymile*, 39 FMSHRC at 1359. Of course, this form of persuasive deference also requires both a finding of genuine ambiguity and an analysis of the above factors. The regulation in this case is not genuinely ambiguous, nor was there an analysis of the several *Auer* factors in any event. Finally, for the Secretary to interpret a regulation contrary to the earlier pronouncements in the Preamble make both *Auer* deference and *Skidmore* persuasion inappropriate. *Id.* at 1352.

2007 and this particular history was not analyzed. Moreover, the Court did not

address certain obviously important parts of the Preamble for that history. For

example, the Preamble notes:

> An operator's history of violations under existing section 100.3(c) is based **solely on the overall number of violations cited against an operator _during_ a preceding 24-month period**. Under the proposal, the period of time would be shortened to 15 months and an operator's history of violations **would include two components: the total number of violations and the number of repeat violations in that 15-month period.**

Preamble, 72 Fed. Reg. 13603 (emphasis added).

This is a clear (albeit earlier) expression by the Secretary that the intent of the

rule was to only capture "violations cited" during the 15-month period. It also seems

from this statement that the reduction from 24 months to 15 months in 2007 was

offset by the new penalty provisions for repeat violations.

With regard to the Preamble and the Program Policy Manual, the ALJ

suggested, but did not hold, that certain provisions of the Preamble and the Program

Policy Manual support the Secretary.[7] Then the ALJ held that "[v]arious passages

of the Preamble also support the Respondent's argument." Decision, p. 6 [JA____].

In passing, the ALJ noted that "Courts have held that agency interpretations that lack

---

[7] The way the ALJ presented this was "[i]n support of its interpretation, the Secretary submits language from the Preamble to the Final Rule, as well as MSHA's Program Policy Manual." Decision, p. 5 [JA____]. The ALJ never states directly that these provisions actually support the Secretary's view, nor how they do so.

the force of law, such as those in opinion letters and policy manuals, are not entitled to *Chevron*-style deference when used to interpret ambiguous statutes but do receive deference under *Auer* when interpreting ambiguous regulations." *Id*. (*citing*, *Christensen v. Harris Cnty*, 529 U.S. 576, 587 (2000).

What is missing in the Decision is an analysis of the actual words and structure of the regulation and an affirmative determination of whether it is possible to simply apply them logically, as written, using all the tools of construction, as required by Part 1 of *Kisor*. What is also missing is Part 2 of *Kisor*, if the regulation were to be deemed ambiguous after a thorough analysis, in that the ALJ should have undertaken to determine whether the Secretary's view is reasonable, consistent with the regulations, represents the agency's reasoned and authoritative judgment, and falls within the agency's expertise.

In the past, where an analysis of factors is required and an ALJ fails to undertake the complete analysis of all of the factors, the Commission has not hesitated to reverse the ALJ's Decision. For example, for unwarrantable failure citations and orders, "it is necessary for a judge to consider all relevant factors, rather than relying on one to the exclusion of others." *IO Coal*, 31 FMSHRC 1346 (F.M.S.H.R.C.), 20091351 (*citing*, *Windsor Coal Co*., 21 FMSHRC 997, 1001 (Sept. 1999) (Commission). When an ALJ fails to fully analyze the *IO Coal* factors, the Commission will reverse an unwarrantable failure decision. *e.g*., *CONSOL*

*Pennsylvania Coal Company*, 39 FMSHRC 1893, 1909, 2017 WL 4586223, at *14

("The judge, after referring to the proper standard for unwarrantable failure set forth

in Commission precedent, failed to apply it"). Surely the admonitions of the United

States Supreme Court in *Kisor* warrant similar adherence and scrutiny.

When revising existing 30 C.F.R. § 100.3(c) to its current form in 2007,

MSHA took the opportunity to remove ambiguities from the regulation that it now

wishes to claim are present. See, Criteria and Procedures for Proposed Assessment

of Civil Penalties; Final Rule - Mine Safety and Health Administration, 72 FR

13592, 13603-13610. Specifically, MSHA stated:

> MSHA has determined that the proposed 15-month period will provide
> the Agency with sufficient data to accurately evaluate an operator's
> compliance record, including any trend….MSHA…determined that
> because it takes approximately three months for a penalty assessment
> to become a final order of the Commission, the proposed 15-month
> period would provide the Agency with at least one full year of data for
> coal and metal and nonmetal operations, and for independent
> contractors.

Preamble, 72 Fed. Reg. 13604 (emphasis added).

> Further MSHA stated:

> MSHA believes that operators who violate the Mine Act and MSHA's
> health and safety standards should receive penalties for those violations
> **as close as practicable to the time the violation occurs in order to
> provide a more appropriate incentive for changing compliance
> behavio**r.

*Id.* (emphasis added)

Clearly, when MSHA adopted final 30 C.F.R. § 100.3(c) the Agency intended to only include in its history of violations criteria those violations issued within the preceding 15-month period that had been paid, finally adjudicated, or become final orders of the Commission. To now take a different approach to this regulation and ignore the history, cuts against the Agency's own earlier stated intent, the unambiguous language of its promulgated regulation, and unfairly increases penalties assessed against independent contractors by over-inflating a contractor's penalty points.

Based on the ALJ's failure to follow *Kisor*, which requires a full analysis of factors affecting deference, the ALJ committed an error of law that is contrary to *Auer* and *Kisor*. Accordingly, the Court should reverse the Decision and find that 30 C.F.R. § 100.3(c) is unambiguous and is enforceable as written. Based on the stipulated evidence the "history of past violations" for GMS should be 0 for all citations and the penalty should be reduced to $3,268.

C.    **The Commission erred as a matter of law in its interpretation of 30 C.F.R. § 100.3(c) and this conclusion was not "within the bounds of reasonable interpretation."**

The second important rule of *Kisor* is that [i]f genuine ambiguity remains, the agency's reading must still fall "within the bounds of reasonable interpretation." *Kisor*, 139 S. Ct. at 2416. The Court added: "even then, not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference. Rather, a

court must also make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight. *Id*. at 2405-06.

Thus, even if a regulation is correctly deemed ambiguous, an agency's interpretation is not unfettered, and additional analysis is required. *See, Peabody Midwest Mining, LLC*, 41 FMSHRC 409, 424–25, 2019 WL 3251362, at *12 (*citing*, *Hobet Mining Co*., 26 FMSHRC 890, 899 (Nov. 2004) (ALJ)) The interpretation must still meet the following requirements: 1) it must be reasonable *See*, *Kisor*, 139 S. Ct. at 2416; 2) it cannot be erroneous or inconsistent with the regulation or regulatory framework *Kisor*, 139 S. Ct. at 2409; 3) it must represent the agency's fair, considered and authoritative judgment. *See*, *Kisor*, 139 S. Ct. at 2417; and 4) it must relate to the agency's expertise. *Kisor*, 139 S. Ct. at 2417. ("Some interpretive issues may fall more naturally into a judge's bailiwick. Take one requiring the elucidation of a simple common-law property term…or one concerning the award of an attorney's fee). *Kisor*, 139 S. Ct. at 2417.

The Secretary relies on two extra-regulatory sources to support his proposed reading of 30 C.F.R. § 100.3(a). First, he relies on the Preamble in the Federal Register and second, he relies on a portion of the Program Policy Manual. Decision, p. 5 [JA___]. However, neither of these are adequate to meet the reasonableness requirements of *Kisor*. In any event, they, like the language of the regulation, do not support the Secretary's position.

"Turning first to the Preamble for 30 C.F.R. § 100.3 in the Federal Register,[8] the clear answer to the present dispute is imbedded therein (72 Fed. Reg. 13604), where MSHA noted:

> it takes approximately three months for a penalty assessment to become a final order of the Commission, the proposed 15-month period would provide the Agency with at least one full year of data for coal and metal and nonmetal operations, and for independent contractors.

*Id.* (emphasis added). This provision is wholly consistent with the 3-step process outlined in Section A above.

There is no question that this applies to independent contractors as well. The Preamble also states:

> For independent contractors, there is a negligible difference between calculating and independent contractor's history of violations under the proposed rule and under the existing rule. ***This is so because it generally takes up to three months for a violation to become a final order and, therefore, the 15 month period provides MSHA with at least one full year of data from which to calculate violation history***.

*Id.*

From these statements, it is patently clear that the drafters of § 100.3(c) never intended that the Secretary should count citations without regard to their date of

---

[8] Of course, using the Preamble or legislative history as a substitute for rulemaking is fraught with potential error. For example, in *Doe Run Company*, 42 FMSHRC 521, 534, 2020 WL 5096935, at *10, The Commission noted that: "[i]t is not the role of the Commission, through case law, to attempt to satisfy legislative history while implying that the Secretary himself has clearly ignored that history in carrying out his standard-setting function."

issuance (i.e. those older than the preceding 15 months). It was always the drafters' intent that history points should be limited to those citations issued and that had become final during the prior 15-month period because those are the violations deemed important for purposes of the disincentive created by "history of violations" criteria in the regulation. Otherwise, the phrase above, "at least one full year of data" would have no meaning whatsoever. That phrase must be understood to have meaning, and it can only mean that history points are accumulated based on "fifteen months minus the three month average process time." The Secretary should count only those citations or orders which were issued during the preceding 15-months but only to the extent that those citations/orders have resulted in a final conclusion that a violation had, in fact, occurred. MSHA's current interpretation cannot be "within the bounds of a reasonable interpretation" or the authoritative judgment of MSHA if it conflicts with both the regulation itself and the Preamble to the very rule.

The Secretary also seeks to rely on the Program Policy Manual, Volume III, to support his position, but the Program Policy Manual is not the law, does not say what the Secretary contends and does not countermand the plain meaning of 30 C.F.R. § 100.3(c). The relevant provision states:

> Overall history is based on the number of citations/orders issued to the mine operator at the applicable mine that became final orders of the Federal Mine Safety and Health Review Commission (Commission) in the 15 months preceding the occurrence date of the violation being assessed.

Decision, p. 5 [JA____].

A fair reading of this language clearly requires that the citations be "issued to the mine operator…that become final orders…in the [preceding] 15 months." In other words, it actually supports Respondent's position that the citations must be issued and become final in the 15-month period, consistent with 30 C.F.R. § 100.3(c).

Further, this is consistent with the Preamble which states:

MSHA's definition of VPID (Violation Per Inspection Day) is calculated by taking the total number of **assessed violations at a mine for a specified period of time** that have either been paid or have become a final order of the Commission and dividing it by the total number of inspection days at the mine **during the same specified period**. There is no functional difference between a violation that an operator pays and a final order of the Commission.

Preamble, 72 F. Reg. 13604 (emphasis added).

This portion of the Preamble is consistent with GMS' contentions related to the meaning of "15 months."

When, as here, the Secretary's interpretation is not based on a "ruling, interpretation or opinion," is inconsistent with the wording of the regulation, does not follow MSHA's earlier declarations in the Preamble, neither *Auer/Kisor* deference nor *Skidmore* persuasion is appropriate. *See Peabody Twentymile*, 39 FMSHRC at 1359 (Commissioners Althen and Young).

39

In the end, the ALJ's Decision to adopt the Secretary's proffered interpretation was "not within the bounds of reasonable interpretation," was an error of law which is contrary to *Auer* and *Kisor* and deals with a substantial question of law, policy and discretion. Accordingly, the Decision should be reversed.

### D.    The Commission erred by deferring to the Secretary's interpretation of 30 C.F.R. § 100.3(c), where the interpretation involves a procedural and non-technical issue of a judicial nature.

In this case, the calculation and assessment of a penalty is normally a judicial determination and is not a technical mining safety issue for which the Secretary might otherwise have special expertise. This is an administrative issue requiring no mining experience to consider and resolve and is therefore not the type of regulation which customarily receives deference.

The *Kisor* Court held:

> And although the limits of Auer deference are not susceptible to any rigid test, we have noted various circumstances in which such deference is "unwarranted." Ibid. In particular, that will be so when a court concludes that an interpretation does not reflect an agency's authoritative, **expertise-based,** "fair [,or] considered judgment." *Ibid.* (*quoting Auer*, 519 U. S., at 462, 117 S. Ct. 905, 137 L. Ed. 2d 79); *cf. United States v. Mead Corp.*, 533 U. S. 218, 229-231, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) (adopting a similar approach to *Chevron* deference).

*Id.* at 2414 (emphasis added).

In *Kisor*, the Supreme Court also held:

> Some interpretive issues may fall more naturally into a judge's bailiwick. Take one requiring the elucidation of a simple common-law property term…or one concerning the award of an attorney's fee.

*Kisor*, 139 S. Ct. at 2417.

In this case, the 15-month lookback period is a procedural matter. MSHA's mining safety expertise is not implicated in this case. Accordingly, this is one "circumstance," as described in *Kisor*, where deference is simply unwarranted even if the regulation was genuinely ambiguous.

### E.    The ALJ erred when he misinterpreted material facts.

30 U.S.C. § 816(a)(1) clearly provides that "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record as a whole, shall be conclusive." Conversely, findings of fact not supported by the substantial evidence in the record are "erroneous as a matter of law and not conclusive." See *Shea-S&M Ball v. Massman-Kiewit-Early*, 606 F.2d 1245, 1251 (D.C. Cir. 1979) (citing, *Hoffman v. United States*, 340 F.2d 645, 650-51 (U.S. Ct. Cl. 1964)).

In the Decision, the ALJ misinterpreted certain material facts. First, he held that "[t]here is no disagreement that citations and orders that have become final in the 15-month period are included." Decision, p. 5 [JA___]. This finding of fact is demonstrably different from the actual stipulation of the parties, which provides: "In

assessing the penalty points for the VPID criteria **MSHA considers** all citations or orders that became final during the 15-month period immediately preceding the issuance of the citation or order being assessed." Decision, p. 5 [JA___] (emphasis added). This was a stipulation setting forth MSHA's position, not that of GMS. GMS certainly does not agree that "**all** citations and orders that have become final in the 15-month period are included." Rather, GMS's position, consistent with 30 C.F.R. § 100.3(c) is that only violations which are issued and become final (i.e., which are paid, adjudicated or become final orders) within the preceding 15 months are included.

The ALJ also concludes his Decision with a statement that is clearly wrong and not supported by any record evidence, holding:

> Under the Respondent's interpretation of the regulation, most (if not all) violations would not be considered in the penalty assessment. This is due to the fact that **when an operator contests a citation or order, it rarely becomes final within 15 months**.

Decision, p. 6 (emphasis added) [JA___].

There is no record evidence to support the ALJ's finding of fact that "most (if not all) violations would not be considered in the penalty assessment." This statement was made at the invitation of the Secretary and was based on the Secretary's reference in its underlying brief to anecdotal decisions of the Commission in recent contested administrative cases. *See,* Secretary's Brief, p. 14-15. In no way are such anecdotal decisions in "merits" cases, following a contested

administrative hearing, indicative of the length of time it takes for all citations to become final. The vast majority of citations are either paid immediately or settled. Both the Secretary and the Judge know this.

Not to mention that the Secretary's anecdotal evidence from contested cases is fundamentally at odds with the Secretary's own Preamble to the regulation. 72 Fed. Reg. 13604. It is almost as though the Secretary is now attempting to re-write the regulation to ignore its own Preamble, simply to meet its current alleged perception of the time it takes for *contested* citations to become a final order, again, without notice and comment rule-making.

The assertions of the Secretary further conflict with a publicly available report of the Commission, which indicates that the ALJ's assertion that citations and orders rarely become final in 15 months is demonstrably inaccurate. Even contested cases are normally resolved much quicker. See, Federal Mine Safety and Health Review Commission Congressional Budget Justification and Annual Performance Plan for Fiscal Year 2023, p. 16. https://www.fmshrc.gov/plans /FY2023%2520Justification%2520April.pdf. (Noting that the normal time for Administrative Law Judge disposition of a *contested* case is approximately 180 days and that only 20% of contested cases are on hand after one year).

Finally, the ALJ's finding conflicts with the fact that when an operator simply pays a citation, it is not even referred to an Administrative Law Judge. The

regulations directly provide that "[i]f the proposed penalty is not paid or contested within 30 days of receipt, the proposed penalty becomes a final order of the Commission and is not subject to review by any court or agency." 30 C.F.R. § 100.7(c).[9]

As noted in the Preamble, MSHA was fully aware of the potential for delays, even in *some* contested cases and wrote about the time for these in the Preamble. When the regulation was drafted, MSHA made a policy decision that this was acceptable and even if every operator contested citations, there would still be 12 months of historical data. The ALJ committed error by making these findings of fact without record evidence.

### F.    The ALJ erred when he based his decision on his own policy pronouncement.

The ALJ also inappropriately found that GMS's position would lead to "perverse incentive for operators to simply contest every citation and order." Decision, p. 6 [JA___]. Neither the Secretary nor the ALJ presented **facts** to support this baseless assertion that operators will intentionally delay the adjudication of citations for inappropriate reasons. Conversely, there is no basis to assert the reverse

---

[9] Similarly, 29 C.F.R. § 2700.27 provides:

> [i]f, within 30 days from the receipt of the Secretary's proposed penalty assessment, the operator or other person fails to notify the Secretary that he contests the proposed penalty, the Secretary's proposed penalty assessment shall be deemed to be a final order of the Commission not subject to review by any court or agency.

argument that the Secretary would have less incentive to actively prosecute cases if his position is adopted.

The reality is that operators will not base their contest decisions on one penalty criterion and there is no evidence to the contrary. Moreover, the Commission always retains the domain to approve settlements and penalize frivolous contests. Not only is there no evidence that the conduct of mine operators will change if 30 C.F.R. § 100.3(c) is applied as it is written, this should not even be a consideration. Frankly, it appears to be an unsupported policy opinion by the ALJ. After all, from the Court's perspective, the important thing should be whether the regulation is applied correctly, as written, not the policy behind the regulation.

The Supreme Court in *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150, 158 (1991)) made it clear that a court should not substitute its policy interpretation for that of the agency. Here, when promulgating 30 C.F.R. § 100.3(c), the Secretary made a policy decision and deemed that a 15-month lookback period was adequate for determining the violation history of a contractor.

MSHA itself recognized, in the Preamble to the regulation, that contests, authorized by the Mine Act, are "baked into" the regulation. In this regard, the Preamble stated:

> …it takes approximately three months for a penalty assessment to become a final order of the Commission, the proposed 15-month period

45

would provide the Agency with at least one full year of data for coal and metal and nonmetal operations, and for independent contractors.

Preamble, 72 Fed. Reg. 13604[10]

These errors of fact are clearly wrong, not supported by the substantial evidence and materially adversely affected the outcome of the Decision and should cause this Court to reverse the Decision.

## **CONCLUSION**

The text of 30 C.F.R. § 100.3(c) is clear and unambiguous in its requirement that a violation must be issued in and be final (i.e., paid, adjudicated or become final a final order of the Commission) in the preceding 15-month period in order to be counted in an operator's history. The regulation can be applied as written with a simple 3-step process. The Court erred when declaring the regulation to be ambiguous and failed to test the reasonableness of the Secretary's position. For the reasons set forth herein, GMS Mine Repair respectfully requests that the Commission grant this Petition and reverse the ALJ's Decision as to GMS's violation history and the resulting penalty amounts for Citation Nos. 9298012, 9298013, 9298015, 9298016 and 9293663, and find that the Decision erroneously deferred to the Secretary's interpretation of 30 C.F.R. § 100.3(c) and erroneously

---

[10] The drafters of § 100.3(c) clearly had a different view than the ALJ, and now the Secretary, of how long it takes to prosecute the average case but, more importantly, the drafters considered this issue and viewed it differently than the ALJ.

considered violations which were issued prior to the 15-month period preceding the issuance of the citations in Docket No. 2021-0431, when determining the contractor's violation history. This Court should order, pursuant with the factual stipulations of the parties, that GMS's history of previous violations during the lookback period in this case is zero and GMS should pay a penalty of $3,268.

Respectfully submitted,

GMS MINE REPAIR,
By Counsel:

/s/ James P. McHugh
James P. McHugh (D.C. Bar No. 56277)
Christopher D. Pence (D.C. Bar No. 53362)
HARDY PENCE, PLLC
10 Hale Street, 4th Floor
Charleston, WV 25301
304-345-7250 (office)
304-553-7227 (fax)
jmchugh@hardypence.com
cpence@hardypence.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*11,139*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.    This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>October 25, 2022</u>       <u>/s/ James P. McHugh</u>
                                          *Counsel for Petitioner*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 25th day of October, 2022, I caused this Page-Proof Brief of Petitioner to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Emily T. Scott
Robert S. Wilson
U.S. Department of Labor
Mine Safety & Health Administration
201 12th Street South, Suite 401
Arlington, VA 22202
*Counsel for Respondent Secretary of Labor,*
*Mine Safety and Health Administration*

Thaddeus Jason Riley
Office of General Counsel
Federal Mine Safety and Health Review Commission
1331 Pennsylvania Ave., NW, Suite 520N
Washington, D.C. 20004
*Counsel for Respondent Federal Mine Safety and*
*Health Review Commission*

/s/ James P. McHugh
*Counsel for Petitioner*

# **ADDENDUM**

# **TABLE OF CONTENTS**

**Appendix Page**

30 U.S.C. § 802 ............................................................................Add.1

30 U.S.C. § 815 ............................................................................Add.2

30 U.S.C. § 816 ............................................................................Add.6

30 U.S.C. § 823 ............................................................................Add.8

29 C.F.R. § 2700.26 .....................................................................Add.12

29 C.F.R. § 2700.27 .....................................................................Add.12

29 C.F.R. § 2700.67 .....................................................................Add.12

29 C.F.R. § 2700.70 .....................................................................Add.14

30 C.F.R. § 100.3 .........................................................................Add.15

30 C.F.R. § 100.7 .........................................................................Add.29

Preamble to 72 FR 13592 .............................................................Add.30

**30 U.S.C. § 802**

§ 802. Definitions

For the purpose of this chapter, the term—

(a) "Secretary" means the Secretary of Labor or his delegate;

(b) "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between a place in a State and any place outside thereof, or within the District of Columbia or a possession of the United States, or between points in the same State but through a point outside thereof;

(c) "State" includes a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Trust Territory of the Pacific Islands;

(d) "operator" means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine;

(e) "agent" means any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine;

(f) "person" means any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization;

(g) "miner" means any individual working in a coal or other mine;

(h)

    (1) "coal or other mine" means (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground, (B) private ways and roads appurtenant to such area, and (C) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities. In making a determination of what constitutes mineral milling for purposes of this chapter, the Secretary shall give due consideration to the convenience of administration resulting from the delegation to one Assistant Secretary of all authority with respect to the health and safety of miners employed at one physical establishment;

    (2) For purposes of subchapters II, III, and IV, "coal mine" means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, or to be used in, or

resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities;

(i) "work of preparing the coal" means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine;

(j) "imminent danger" means the existence of any condition or practice in a coal or other mine which could reasonably be expected to cause death or serious physical harm before such condition or practice can be abated;

(k) "accident" includes a mine explosion, mine ignition, mine fire, or mine inundation, or injury to, or death of, any person;

(l) "mandatory health or safety standard" means the interim mandatory health or safety standards established by subchapters II and III of this chapter, and the standards promulgated pursuant to subchapter I of this chapter;

(m) "Panel" means the Interim Compliance Panel established by this chapter; and

(n) "Administration" means the Mine Safety and Health Administration in the Department of Labor.

(o) "Commission" means the Federal Mine Safety and Health Review Commission.

(PUB. L. 91–173, § 3, Dec. 30, 1969, 83 STAT. 743; PUB. L. 95–164, TITLE I, § 102(B), Nov. 9, 1977, 91 STAT. 1290.)

## 30 U.S.C. § 815

§ 815. Procedure for enforcement

(a) Notification of civil penalty; contest

If, after an inspection or investigation, the Secretary issues a citation or order under SECTION 814 OF THIS TITLE, he shall, within a reasonable time after the termination of such inspection or investigation, notify the operator by certified mail of the civil penalty proposed to be assessed under SECTION 820(A) OF THIS TITLE for the violation cited and that the operator has 30 days within which to notify the Secretary that he wishes to contest the citation or proposed assessment of penalty. A copy of such notification shall be sent by mail to the representative of miners in such mine. If, within 30 days from the receipt of the notification issued by the Secretary, the operator fails to notify the Secretary that he intends to contest the citation or the proposed assessment of penalty, and no notice is filed by any miner or representative of miners under subsection (d) of this section within such time, the citation and the proposed assessment of penalty shall be deemed a final order of the

Commission and not subject to review by any court or agency. Refusal by the operator or his agent to accept certified mail containing a citation and proposed assessment of penalty under this subsection shall constitute receipt thereof within the meaning of this subsection.

(b) Failure of operator to correct violation; notification; contest; temporary relief
(1)
> (A) If the Secretary has reason to believe that an operator has failed to correct a violation for which a citation has been issued within the period permitted for its correction, the Secretary shall notify the operator by certified mail of such failure and of the penalty proposed to be assessed under SECTION 820(B) OF THIS TITLE by reason of such failure and that the operator has 30 days within which to notify the Secretary that he wishes to contest the Secretary's notification of the proposed assessment of penalty. A copy of such notification of the proposed assessment of penalty shall at the same time be sent by mail to the representative of the mine employees. If, within 30 days from the receipt of notification of proposed assessment of penalty issued by the Secretary, the operator fails to notify the Secretary that he intends to contest the notification of proposed assessment of penalty, such notification shall be deemed a final order of the Commission and not subject to review by any court or agency. Refusal by the operator or his agent to accept certified mail containing a notification of proposed assessment of penalty issued under this subsection shall constitute receipt thereof within the meaning of this subsection.
> (B) In determining whether to propose a penalty to be assessed under SECTION 820(B) OF THIS TITLE, the Secretary shall consider the operator's history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation.

(2) An applicant may file with the Commission a written request that the Commission grant temporary relief from any modification or termination of any order or from any order issued under SECTION 814 OF THIS TITLE together with a detailed statement giving the reasons for granting such relief. The Commission may grant such relief under such conditions as it may prescribe, if—
> (A) a hearing has been held in which all parties were given an opportunity to be heard;
> (B) the applicant shows that there is substantial likelihood that the findings of the Commission will be favorable to the applicant; and

(C) such relief will not adversely affect the health and safety of miners.

No temporary relief shall be granted in the case of a citation issued under subsection (a) or (f) of SECTION 814 OF THIS TITLE. The Commission shall provide a procedure for expedited consideration of applications for temporary relief under this paragraph.

(c) Discrimination or interference prohibited; complaint; investigation; determination; hearing

(1) No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, representative of miners or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, or because such miner, representative of miners or applicant for employment is the subject of medical evaluations and potential transfer under a standard published pursuant to SECTION 811 OF THIS TITLE or because such miner, representative of miners or applicant for employment has instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter.

(2) Any miner or applicant for employment or representative of miners who believes that he has been discharged, interfered with, or otherwise discriminated against by any person in violation of this subsection may, within 60 days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall forward a copy of the complaint to the respondent and shall cause such investigation to be made as he deems appropriate. Such investigation shall commence within 15 days of the Secretary's receipt of the complaint, and if the Secretary finds that such complaint was not frivolously brought, the Commission, on an expedited basis upon application of the Secretary, shall order the immediate reinstatement of the miner pending final order on the complaint. If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall immediately file a complaint with the Commission, with service upon the alleged violator and the miner, applicant for employment, or representative of miners alleging such discrimination or interference and propose an order granting appropriate relief. The Commission shall afford an opportunity for a hearing (in accordance with SECTION 554 OF TITLE 5 but without regard to subsection (a)(3) of such section) and thereafter shall issue an

order, based upon findings of fact, affirming, modifying, or vacating the Secretary's proposed order, or directing other appropriate relief. Such order shall become final 30 days after its issuance. The Commission shall have authority in such proceedings to require a person committing a violation of this subsection to take such affirmative action to abate the violation as the Commission deems appropriate, including, but not limited to, the rehiring or reinstatement of the miner to his former position with back pay and interest. The complaining miner, applicant, or representative of miners may present additional evidence on his own behalf during any hearing held pursuant to his 1

[1 So in original. Probably should be "this".]

paragraph.

(3) Within 90 days of the receipt of a complaint filed under paragraph (2), the Secretary shall notify, in writing, the miner, applicant for employment, or representative of miners of his determination whether a violation has occurred. If the Secretary, upon investigation, determines that the provisions of this subsection have not been violated, the complainant shall have the right, within 30 days of notice of the Secretary's determination, to file an action in his own behalf before the Commission, charging discrimination or interference in violation of paragraph (1). The Commission shall afford an opportunity for a hearing (in accordance with SECTION 554 OF TITLE 5 but without regard to subsection (a)(3) of such section), and thereafter shall issue an order, based upon findings of fact, dismissing or sustaining the complainant's charges and, if the charges are sustained, granting such relief as it deems appropriate, including, but not limited to, an order requiring the rehiring or reinstatement of the miner to his former position with back pay and interest or such remedy as may be appropriate. Such order shall become final 30 days after its issuance. Whenever an order is issued sustaining the complainant's charges under this subsection, a sum equal to the aggregate amount of all costs and expenses (including attorney's fees) as determined by the Commission to have been reasonably incurred by the miner, applicant for employment or representative of miners for, or in connection with, the institution and prosecution of such proceedings shall be assessed against the person committing such violation. Proceedings under this section shall be expedited by the Secretary and the Commission. Any order issued by the Commission under this paragraph shall be subject to judicial review in accordance with SECTION 816 OF THIS TITLE. Violations by any person of paragraph (1) shall be subject to the provisions of sections 818 and 820(a) of this title.

(d) Contest proceedings; hearing; findings of fact; affirmance, modification, or vacatur of citation, order, or proposed penalty; procedure before Commission

If, within 30 days of receipt thereof, an operator of a coal or other mine notifies the Secretary that he intends to contest the issuance or modification of an order issued

under SECTION 814 OF THIS TITLE, or citation or a notification of proposed assessment of a penalty issued under subsection (a) or (b) of this section, or the reasonableness of the length of abatement time fixed in a citation or modification thereof issued under SECTION 814 OF THIS TITLE, or any miner or representative of miners notifies the Secretary of an intention to contest the issuance, modification, or termination of any order issued under SECTION 814 OF THIS TITLE, or the reasonableness of the length of time set for abatement by a citation or modification thereof issued under SECTION 814 OF THIS TITLE, the Secretary shall immediately advise the Commission of such notification, and the Commission shall afford an opportunity for a hearing (in accordance with SECTION 554 OF TITLE 5, but without regard to subsection (a)(3) of such section), and thereafter shall issue an order, based on findings of fact, affirming, modifying, or vacating the Secretary's citation, order, or proposed penalty, or directing other appropriate relief. Such order shall become final 30 days after its issuance. The rules of procedure prescribed by the Commission shall provide affected miners or representatives of affected miners an opportunity to participate as parties to hearings under this section. The Commission shall take whatever action is necessary to expedite proceedings for hearing appeals of orders issued under SECTION 814 OF THIS TITLE.

(PUB. L. 91–173, TITLE I, § 105, Dec. 30, 1969, 83 STAT. 753; PUB. L. 95–164, TITLE II, § 201, Nov. 9, 1977, 91 STAT. 1303.)

**30 U.S.C. § 816**

§ 816. Judicial review of Commission orders
(a) Petition by person adversely affected or aggrieved; temporary relief
(1) Any person adversely affected or aggrieved by an order of the Commission issued under this chapter may obtain a review of such order in any United States court of appeals for the circuit in which the violation is alleged to have occurred or in the United States Court of Appeals for the District of Columbia Circuit, by filing in such court within 30 days following the issuance of such order a written petition praying that the order be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission and to the other parties, and thereupon the Commission shall file in the court the record in the proceeding as provided in SECTION 2112 OF TITLE 28. Upon such filing, the court shall have exclusive jurisdiction of the proceeding and of the questions determined therein, and shall have the power to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside, in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified. No objection that has not been urged

before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Commission, the court may order such additional evidence to be taken before the Commission and to be made a part of the record. The Commission may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact, if supported by substantial evidence on the record considered as a wh

(2) In the case of a proceeding to review any order or decision issued by the Commission under this chapter, except an order or decision pertaining to an order issued under SECTION 817(A) OF THIS TITLE or an order or decision pertaining to a citation issued under section 814(a) or (f) of this title, the court may, under such conditions as it may prescribe, grant such temporary relief as it deems appropriate pending final determination of the proceeding, if—

    (A) all parties to the proceeding have been notified and given an opportunity to be heard on a request for temporary relief;

    (B) the person requesting such relief shows that there is a substantial likelihood that he will prevail on the merits of the final determination of the proceeding; and

    (C) such relief will not adversely affect the health and safety of miners in the coal or other mine.

(3) In the case of a proceeding to review any order or decision issued by the Panel under this chapter, the court may, under such conditions as it may prescribe, grant such temporary relief as it deems appropriate pending final determination of the proceeding, if—

    (A) all parties to the proceeding have been notified and given an opportunity to be heard on a request for temporary relief; and

    (B) the person requesting such relief shows that there is a substantial likelihood that he will prevail on the merits of the final determination of the proceeding.

(b) Petition by Secretary for review or enforcement of final Commission orders

The Secretary may also obtain review or enforcement of any final order of the Commission by filing a petition for such relief in the United States court of appeals for the circuit in which the alleged violation occurred or in the Court of Appeals for the District of Columbia Circuit, and the provisions of subsection (a) shall govern

such proceedings to the extent applicable. If no petition for review, as provided in subsection (a), is filed within 30 days after issuance of the Commission's order, the Commission's findings of fact and order shall be conclusive in connection with any petition for enforcement which is filed by the Secretary after the expiration of such 30-day period. In any such case, as well as in the case of a noncontested citation or notification by the Secretary which has become a final order of the Commission under subsection (a) or (b) of SECTION 815 OF THIS TITLE, the clerk of the court, unless otherwise ordered by the court, shall forthwith enter a decree enforcing the order and shall transmit a copy of such decree to the Secretary and the operator named in the petition. In any contempt proceeding brought to enforce a decree of a court of appeals entered pursuant to this subsection or subsection (a), the court of appeals may assess the penalties provided in SECTION 820 OF THIS TITLE, in addition to invoking any other available remedies.

(c) Stay of order or decision of Commission or Panel

The commencement of a proceeding under this section shall not, unless specifically ordered by the court, operate as a stay of the order or decision of the Commission or the Panel.

(PUB. L. 91–173, TITLE I, § 106, Dec. 30, 1969, 83 STAT. 754; PUB. L. 95–164, TITLE II, § 201, Nov. 9, 1977, 91 STAT. 1306; PUB. L. 98–620, TITLE IV, § 402(34), Nov. 8, 1984, 98 STAT. 3360.)

**30 U.S.C. § 823**

§ 823. Federal Mine Safety and Health Review Commission

(a) Establishment; membership; chairman

The Federal Mine Safety and Health Review Commission is hereby established. The Commission shall consist of five members, appointed by the President by and with the advice and consent of the Senate, from among persons who by reason of training, education, or experience are qualified to carry out the functions of the Commission under this chapter. The President shall designate one of the members of the Commission to serve as Chairman.

(b) Terms; personnel; administrative law judges

(1) The terms of the members of the Commission shall be six years, except that—

(A) members of the Commission first taking office after November 9, 1977, shall serve, as designated by the President at the time of appointment, one for a term of two years, two for a term of four years and two for a term of six years; and

Add.8

(B) a vacancy caused by the death, resignation, or removal of any member prior to the expiration of the term for which he was appointed shall be filled only for the remainder of such unexpired term.

Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office.

(2) The Chairman shall be responsible on behalf of the Commission for the administrative operations of the Commission. The Commission shall appoint such employees as it deems necessary to assist in the performance of the Commission's functions and to fix their compensation in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of title 5, relating to classification and general pay rates. Upon the effective date of the Federal Mine Safety and Health Amendments Act of 1977, the administrative law judges assigned to the Arlington, Virginia, facility of the Office of Hearings and Appeals, United States Department of the Interior, shall be automatically transferred in grade and position to the Federal Mine Safety and Health Review Commission. Notwithstanding the provisions of SECTION 559 OF TITLE 5, the incumbent Chief Administrative Law Judge of the Office of Hearings and Appeals of the Department of the Interior assigned to the Arlington, Virginia facility shall have the option, on the effective date of the Federal Mine Safety and Health Amendments Act of 1977, of transferring to the Commission as an administrative law judge, in the same grade and position as the other administrative law judges. The administrative law judges (except those presiding over Indian Probate Matters) assigned to the Western facilities of the Office of Hearings and Appeals of the Department of the Interior shall remain with that Department at their present grade and position or they shall have the right to transfer on an equivalent basis to that extended in this paragraph to the Arlington, Virginia administrative law judges in accordance with procedures established by the Director of the Office of Personnel Management. The Commission shall appoint such additional administrative law judges as it deems necessary to carry out the functions of the Commission. Assignment, removal, and compensation of administrative law judges shall be in accordance with sections 3105, 3344, 5362 and 7521 of title 5.

(c) Delegation of powers

The Commission is authorized to delegate to any group of three or more members any or all of the powers of the Commission, except that two members shall constitute a quorum of any group designated pursuant to this paragraph.

(d) Proceedings before administrative law judge; administrative review

(1) An administrative law judge appointed by the Commission to hear matters under this chapter shall hear, and make a determination upon, any proceeding instituted before the Commission and any motion in connection therewith, assigned to such administrative law judge by the chief administrative law judge of the Commission

or by the Commission, and shall make a decision which constitutes his final disposition of the proceedings. The decision of the administrative law judge of the Commission shall become the final decision of the Commission 40 days after its issuance unless within such period the Commission has directed that such decision shall be reviewed by the Commission in accordance with paragraph (2). An administrative law judge shall not be assigned to prepare a recommended decision under this chapter.

(2) The Commission shall prescribe rules of procedure for its review of the decisions of administrative law judges in cases under this chapter which shall meet the following standards for review:

(A)

(i) Any person adversely affected or aggrieved by a decision of an administrative law judge, may file and serve a petition for discretionary review by the Commission of such decision within 30 days after the issuance of such decision. Review by the Commission shall not be a matter of right but of the sound discretion of the Commission.

(ii) Petitions for discretionary review shall be filed only upon one or more of the following grounds:(I) A finding or conclusion of material fact is not supported by substantial evidence.(II) A necessary legal conclusion is erroneous.(III) The decision is contrary to law or to the duly promulgated rules or decisions of the Commission.(IV) A substantial question of law, policy or discretion is involved.(V) A prejudicial error of procedure was committed.

(iii) Each issue shall be separately numbered and plainly and concisely stated, and shall be supported by detailed citations to the record when assignments of error are based on the record, and by statutes, regulations, or principal authorities relied upon. Except for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the administrative law judge had not been afforded an opportunity to pass. Review by the Commission shall be granted only by affirmative vote of two of the Commissioners present and voting. If granted, review shall be limited to the questions raised by the petition.

(B) At any time within 30 days after the issuance of a decision of an administrative law judge, the Commission may in its discretion (by affirmative vote of two of the Commissioners present and voting) order the case before it for review but only upon the ground that the decision may be contrary to law or Commission policy, or that a novel question of policy has been presented. The Commission shall state in such order the specific issue of law, Commission policy, or novel question of policy involved. If a party's

petition for discretionary review has been granted, the Commission shall not raise or consider additional issues in such review proceedings except in compliance with the requirements of this paragraph.

(C) For the purpose of review by the Commission under paragraph (A) or (B) of this subsection, the record shall include: (i) all matters constituting the record upon which the decision of the administrative law judge was based; (ii) the rulings upon proposed findings and conclusions; (iii) the decision of the administrative law judge; (iv) the petition or petitions for discretionary review, responses thereto, and the Commission's order for review; and (v) briefs filed on review. No other material shall be considered by the Commission upon review. The Commission either may remand the case to the administrative law judge for further proceedings as it may direct or it may affirm, set aside, or modify the decision or order of the administrative law judge in conformity with the record. If the Commission determines that further evidence is necessary on an issue of fact it shall remand the case for further proceedings before the administrative law judge.

(The provisions of SECTION 557(B) OF TITLE 5 with regard to the review authority of the Commission are expressly superseded to the extent that they are inconsistent with the provisions of subparagraphs (A), (B), and (C) of this paragraph.)

(e) Witnesses and evidence; subpoenas; contempt

In connection with hearings before the Commission or its administrative law judges under this chapter, the Commission and its administrative law judges may compel the attendance and testimony of witnesses and the production of books, papers, or documents, or objects, and order testimony to be taken by deposition at any stage of the proceedings before them. Any person may be compelled to appear and depose and produce similar documentary or physical evidence, in the same manner as witnesses may be compelled to appear and produce evidence before the Commission and its administrative law judges. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States and at depositions ordered by such courts. In case of contumacy, failure, or refusal of any person to obey a subpoena or order of the Commission or an administrative law judge, respectively, to appear, to testify, or to produce documentary or physical evidence, any district court of the United States or the United States courts of any territory or possession, within the jurisdiction of which such person is found, or resides, or transacts business, shall, upon the application of the Commission, or the administrative law judge, respectively, have jurisdiction to issue to such person an order requiring such person to appear, to testify, or to produce evidence as ordered by the Commission or the administrative law judge, respectively, and any failure to obey such order of the court may be punished by the court as a contempt thereof.

Add.11

(PUB. L. 91–173, TITLE I, § 113, as added PUB. L. 95–164, TITLE II, § 201, Nov. 9, 1977, 91 STAT. 1313; 1978 Reorg. Plan No. 2, § 102, eff. Jan. 1, 1979, 43 F.R. 36037, 92 STAT. 3783.)

## 29 C.F.R. § 8700.21

§ 2700.21 Effect of filing notice of contest of citation or order.
(a) The filing of a notice of contest of a citation or order issued under section 104 of the Act, 30 U.S.C. 814, does not constitute a challenge to a proposed penalty assessment that may subsequently be issued by the Secretary under section 105(a) of the Act, 30 U.S.C. 815(a), which is based on that citation or order. A challenge to such a proposed penalty assessment must be filed as a separate notice of contest of the proposed penalty assessment. See § 2700.26.

(b) An operator's failure to file a notice of contest of a citation or order issued under section 104 of the Act, 30 U.S.C. 814, shall not preclude the operator from challenging, in a penalty proceeding, the fact of violation or any special findings contained in a citation or order including the assertion in the citation or order that the violation was of a significant and substantial nature or was caused by the operator's unwarrantable failure to comply with the standard.

[58 FR 12164, Mar. 3, 1993, as amended at 71 FR 44207, Aug. 4, 2006]

## 29 C.F.R. § 2700.27

§ 2700.27 Effect of failure to contest proposed penalty assessment.
If, within 30 days from the receipt of the Secretary's proposed penalty assessment, the operator or other person fails to notify the Secretary that he contests the proposed penalty, the Secretary's proposed penalty assessment shall be deemed to be a final order of the Commission not subject to review by any court or agency.

## 29 C.F.R. § 2700.67

§ 2700.67 Summary decision of the Judge.
(a) Filing of motion for summary decision. At any time after commencement of a proceeding and no later than 25 days before the date fixed for the hearing on the merits, a party may move the Judge to render summary decision disposing of all or part of the proceeding. Filing of a summary decision motion and an opposition thereto shall be effective upon receipt.

(b) Grounds. A motion for summary decision shall be granted only if the entire record, including the pleadings, depositions, answers to interrogatories, admissions, and affidavits, shows:

(1) That there is no genuine issue as to any material fact; and

(2) That the moving party is entitled to summary decision as a matter of law.

(c) Form of motion. A motion shall be accompanied by a memorandum of points and authorities specifying the grounds upon which the party seeks summary decision and a statement of material facts specifying each material fact as to which the party contends there is no genuine issue. Each material fact set forth in the statement shall be supported by a reference to accompanying affidavits or other verified documents.

(d) Form of opposition. An opposition to a motion for summary decision shall include a memorandum of points and authorities specifying why the moving party is not entitled to summary decision and may be supported by affidavits or other verified documents. The opposition shall also include a separate concise statement of each genuine issue of material fact necessary to be litigated, supported by a reference to any accompanying affidavits or other verified documents. Material facts identified as not in issue by the moving party shall be deemed admitted for purposes of the motion unless controverted by the statement in opposition. If a party does not respond in opposition, summary decision, if appropriate, shall be entered in favor of the moving party.

(e) Affidavits. Supporting and opposing affidavits shall be made on personal knowledge and shall show affirmatively that the affiant is competent to testify to the matters stated. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to the affidavit or be incorporated by reference if not otherwise a matter of record. The judge shall permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, admissions, or further affidavits.

(f) Case not fully adjudicated on motion. If a motion for summary decision is denied in whole or in part, the Judge shall ascertain what material facts are controverted and shall issue an order directing further proceedings as appropriate.

[58 FR 12164, Mar. 3, 1993, as amended at 71 FR 44208, Aug. 4, 2006]

**29 C.F.R. § 2700.70**

§ 2700.70 Petitions for discretionary review.

(a) Procedure. Any person adversely affected or aggrieved by a Judge's decision or order may file with the Commission a petition for discretionary review within 30 days after issuance of the decision or order. Filing of a petition for discretionary review is effective upon receipt. Two or more parties may join in the same petition; the Commission may consolidate related petitions. Procedures governing petitions for review of temporary reinstatement orders are found at § 2700.45(f).

(b) Review discretionary. Review by the Commission shall not be a matter of right but of the sound discretion of the Commission. Review by the Commission shall be granted only by affirmative vote of at least two of the Commissioners present and voting.

(c) Grounds. Petitions for discretionary review shall be filed only upon one or more of the following grounds:

(1) A finding or conclusion of material fact is not supported by substantial evidence;

(2) A necessary legal conclusion is erroneous;

(3) The decision is contrary to law or to the duly promulgated rules or decisions of the Commission;

(4) A substantial question of law, policy, or discretion is involved; or

(5) A prejudicial error of procedure was committed.

(d) Requirements. Each issue shall be separately numbered and plainly and concisely stated, and shall be supported by detailed citations to the record, when assignments of error are based on the record, and by statutes, regulations, or other principal authorities relied upon. Except by permission of the Commission and for good cause shown, petitions for discretionary review shall not exceed 35 pages. Except for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the Judge had not been afforded an opportunity to pass.

(e) Statement in opposition to petition. A statement in opposition to a petition for discretionary review may be filed, but the opportunity for such filing shall not require the Commission to delay its action on the petition.

Add.14

(f) Motion for leave to exceed page limit. A motion requesting leave to exceed the page limit shall be received not less than 3 days prior to the date the petition for discretionary review is due to be filed, shall state the total number of pages proposed, and shall comply with § 2700.10. Filing of a motion requesting an extension of page limit is effective upon receipt. The motion and any statement in opposition shall include proof of service on all parties by a means of delivery no less expeditious than that used for filing the motion, except that if service by electronic transmission (email) is impossible, the filing party must serve in person, by third party commercial carrier, or by facsimile transmission, resulting in same-day delivery.

(g) Scope of review. If a petition is granted, review shall be limited to the issues raised by the petition, unless the Commission directs review of additional issues pursuant to § 2700.71.

(h) Denial of petition. A petition not granted within 40 days after the issuance of the Judge's decision is deemed denied.

[58 FR 12164, Mar. 3, 1993, as amended at 64 FR 48713, Sept. 8, 1999; 71 FR 44209, Aug. 4, 2006; 78 FR 77359, Dec. 23, 2013]

**30 C.F.R. § 100.3**

§ 100.3 Determination of penalty amount; regular assessment.

(a) General.

(1) Except as provided in § 100.5(e), the operator of any mine in which a violation occurs of a mandatory health or safety standard or who violates any other provision of the Mine Act, as amended, shall be assessed a civil penalty of not more than $79,428. Each occurrence of a violation of a mandatory safety or health standard may constitute a separate offense. The amount of the proposed civil penalty shall be based on the criteria set forth in sections 105(b) and 110(i) of the Mine Act. These criteria are:

(i) The appropriateness of the penalty to the size of the business of the operator charged;

(ii) The operator's history of previous violations;

(iii) Whether the operator was negligent;

(iv) The gravity of the violation;

(v) The demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation; and

(vi) The effect of the penalty on the operator's ability to continue in business.

(2) A regular assessment is determined by first assigning the appropriate number of penalty points to the violation by using the appropriate criteria and tables set forth in this section. The total number of penalty points will then be converted into a dollar amount under the penalty conversion table in paragraph (g) of this section. The penalty amount will be adjusted for demonstrated good faith in accordance with paragraph (f) of this section.

(b) The appropriateness of the penalty to the size of the business of the operator charged.  The appropriateness of the penalty to the size of the mine operator's business is calculated by using both the size of the mine cited and the size of the mine's controlling entity. The size of coal mines and their controlling entities is measured by coal production. The size of metal and nonmetal mines and their controlling entities is measured by hours worked. The size of independent contractors is measured by the total hours worked at all mines. Penalty points for size are assigned based on Tables I to V. As used in these tables, the terms "annual tonnage" and "annual hours worked" mean coal produced and hours worked in the previous calendar year. In cases where a full year of data is not available, the coal produced or hours worked is prorated to an annual basis. This criterion accounts for a maximum of 25 penalty points.

Table I—Size of Coal Mine

| Annual tonnage of mine | Penalty Points |
|---|---|
| 0 to 7,500 | 1 |
| Over 7,500 to 10,000 | 2 |
| Over 10,000 to 15,000 | 3 |
| Over 15,000 to 20,000 | 4 |
| Over 20,000 to 30,000 | 5 |
| Over 30,000 to 50,000 | 6 |
| Over 50,000 to 70,000 | 7 |
| Over 70,000 to 100,000 | 8 |
| Over 100,000 to 200,000 | 9 |
| Over 200,000 to 300,000 | 10 |
| Over 300,000 to 500,000 | 11 |
| Over 500,000 to 700,000 | 12 |
| Over 700,000 to 1,000,000 | 13 |
| Over 1,000,000 to 2,000,000 | 14 |
| Over 2,000,000 | 15 |

Table II—Size of Controlling Entity—Coal Mine

| Annual tonnage | Penalty Points |
|---|---|
| 0 to 50,000 | 1 |
| Over 50,000 to 100,000 | 2 |
| Over 100,000 to 200,000 | 3 |
| Over 200,000 to 300,000 | 4 |
| Over 300,000 to 500,000 | 5 |
| Over 500,000 to 700,000 | 6 |
| Over 700,000 to 1,000,000 | 7 |
| Over 1,000,000 to 3,000,000 | 8 |
| Over 3,000,000 to 10,000,000 | 9 |
| Over 10,000,000 | 10 |

Add.17

Table III—Size of Metal/Nonmetal Mine

| Annual hours worked at mine | Penalty Points |
|---|---|
| 0 to 5,000 | 0 |
| Over 5,000 to 10,000 | 1 |
| Over 10,000 to 20,000 | 2 |
| Over 20,000 to 30,000 | 3 |
| Over 30,000 to 50,000 | 4 |
| Over 50,000 to 100,000 | 5 |
| Over 100,000 to 200,000 | 6 |
| Over 200,000 to 300,000 | 7 |
| Over 300,000 to 500,000 | 8 |
| Over 500,000 to 700,000 | 9 |
| Over 700,000 to 1,000,000 | 10 |
| Over 1,000,000 to 1,500,000 | 11 |
| Over 1,500,000 to 2,000,000 | 12 |
| Over 2,000,000 to 3,000,000 | 13 |
| Over 3,000,000 to 5,000,000 | 14 |
| Over 5,000,000 | 15 |

Table IV—Size of Controlling Entity—Metal/Nonmetal Mine

| Annual hours worked | Penalty Points |
|---|---|
| 0 to 50,000 | 0 |
| Over 50,000 to 100,000 | 1 |
| Over 100,000 to 200,000 | 2 |
| Over 200,000 to 300,000 | 3 |
| Over 300,000 to 500,000 | 4 |
| Over 500,000 to 1,000,000 | 5 |
| Over 1,000,000 to 2,000,000 | 6 |
| Over 2,000,000 to 3,000,000 | 7 |
| Over 3,000,000 to 5,000,000 | 8 |
| Over 5,000,000 to 10,000,000 | 9 |
| Over 10,000,000 | 10 |

Table V—Size of Independent Contractor

| Annual hours worked at all mines | Penalty Points |
|---|---|
| 0 to 5,000 | 0 |
| Over 5,000 to 7,000 | 2 |
| Over 7,000 to 10,000 | 4 |
| Over 10,000 to 20,000 | 6 |
| Over 20,000 to 30,000 | 8 |
| Over 30,000 to 50,000 | 10 |
| Over 50,000 to 70,000 | 12 |
| Over 70,000 to 100,000 | 14 |
| Over 100,000 to 200,000 | 16 |
| Over 200,000 to 300,000 | 18 |
| Over 300,000 to 500,000 | 20 |
| Over 500,000 to 700,000 | 22 |
| Over 700,000 to 1,000,000 | 24 |
| Over 1,000,000 | 25 |

(C) History of previous violations. An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history. The repeat aspect of the history criterion in paragraph (c)(2) of this section applies only after an operator has received 10 violations or an independent contractor operator has received 6 violations.

(1) Total number of violations. For mine operators, penalty points are assigned on the basis of the number of violations per inspection day (VPID)(Table VI). Penalty points are not assigned for mines with fewer than 10 violations in the specified history period. For independent contractors, penalty points are assigned on the basis of the total number of violations at all mines (Table VII). This aspect of the history criterion accounts for a maximum of 25 penalty points.

Table VI—History of Previous Violations-Mine Operators

| Mine Operator's Overall History of Violations Per Inspection Day | Penalty Points |
|---|---|
| 0 to 0.3 | 0 |
| Over 0.3 to 0.5 | 2 |
| Over 0.5 to 0 7 | 5 |
| Over 0.7 to 0.9 | 8 |
| Over 0.9 to 1.1 | 10 |
| Over 1.1 to 1.3 | 12 |
| Over 1.3 to 1.5 | 14 |
| Over 1.5 to 1.7 | 16 |
| Over 1.7 to 1.9 | 19 |
| Over 1.9 to 2.1 | 22 |
| Over 2.1 | 25 |

Table VII—History of Previous Violations-Independent Contractors

| Independent Contractor's Overall History of Number of Violations | Penalty Points |
|---|---|
| 0 to 5 | 0 |
| 6 | 1 |
| 7 | 2 |
| 8 | 3 |
| 9 | 4 |
| 10 | 5 |
| 11 | 6 |
| 12 | 7 |
| 13 | 8 |
| 14 | 9 |
| 15 | 10 |
| 16 | 11 |
| 17 | 12 |
| 18 | 13 |
| 19 | 14 |
| 20 | 15 |
| 21 | 16 |
| 22 | 17 |
| 23 | 18 |
| 24 | 19 |
| 25 | 20 |
| 26 | 21 |
| 27 | 22 |
| 28 | 23 |
| 29 | 24 |
| Over 29 | 25 |

Add.20

(2) Repeat violations of the same standard. Repeat violation history is based on the number of violations of the same citable provision of a standard in a preceding 15-month period. For coal and metal and nonmetal mine operators with a minimum of six repeat violations, penalty points are assigned on the basis of the number of repeat violations per inspection day (RPID) (Table VIII). For independent contractors, penalty points are assigned on the basis of the number of violations at all mines (Table IX). This aspect of the history criterion accounts for a maximum of 20 penalty points (Table VIII).

Table VIII-History of Previous Violations-Repeat Violations
for Coal and Metal and Nonmetal Operators with a Minimum of
6 Repeat Violations

| Number of Repeat Violations Per Inspection Day | Final Rule Penalty Points |
|---|---|
| 0 to 0.01 | 0 |
| Over 0.01 to 0.015 | 1 |
| Over 0.015 to 0.02 | 2 |
| Over 0.02 to 0.025 | 3 |
| Over 0.025 to 0.03 | 4 |
| Over 0.03 to 0.04 | 5 |
| Over 0.04 to 0.05 | 6 |
| Over 0.05 to 0.06 | 7 |
| Over 0.06 to 0.08 | 8 |
| Over 0.08 to 0.10 | 9 |
| Over 0.10 to 0.12 | 10 |
| Over 0.12 to 0.14 | 11 |
| Over 0.14 to 0.16 | 12 |
| Over 0.16 to 0.18 | 13 |
| Over 0.18 to 0.20 | 14 |
| Over 0.20 to 0.25 | 15 |
| Over 0.25 to 0.3 | 16 |
| Over 0.3 to 0.4 | 17 |
| Over 0.4 to 0.5 | 18 |
| Over 0.5 to 1.0 | 19 |
| Over 1.0 | 20 |

Table IX-History of Previous Violations-Repeat Violations
for Independent Contractors

| Number of Repeat Violations of the Same Standard | Final Rule Penalty Points |
|---|---|
| 5 or fewer | 0 |
| 6 | 2 |
| 7 | 4 |
| 8 | 6 |
| 9 | 8 |
| 10 | 10 |
| 11 | 12 |
| 12 | 14 |
| 13 | 16 |
| 14 | 18 |
| More than 14 | 20 |

Add.22

(d) Negligence.  Negligence is conduct, either by commission or omission, which falls below a standard of care established under the Mine Act to protect miners against the risks of harm. Under the Mine Act, an operator is held to a high standard of care. A mine operator is required to be on the alert for conditions and practices in the mine that affect the safety or health of miners and to take steps necessary to correct or prevent hazardous conditions or practices. The failure to exercise a high standard of care constitutes negligence. The negligence criterion assigns penalty points based on the degree to which the operator failed to exercise a high standard of care. When applying this criterion, MSHA considers mitigating circumstances which may include, but are not limited to, actions taken by the operator to prevent or correct hazardous conditions or practices. This criterion accounts for a maximum of 50 penalty points, based on conduct evaluated according to Table X.

Table X—Negligence

| Categories | Penalty Points |
|---|---|
| No negligence | 0 |
| (The operator exercised diligence and could not have known of the violative condition or practice.) | |
| Low negligence (The operator knew or should have known of the violative condition or practice, but there are considerable mitigating circumstances.) | 10 |
| Moderate negligence (The operator knew or should have known of the violative condition or practice, but there are mitigating circumstances.) | 20 |
| High negligence (The operator knew or should have known of the violative condition or practice, and there are no mitigating circumstances.) | 35 |
| Reckless disregard (The operator displayed conduct which exhibits the absence of the slightest degree of care.) | 50 |

(e) Gravity. Gravity is an evaluation of the seriousness of the violation. This criterion accounts for a maximum of 88 penalty points, as derived from the Tables XI through XIII. Gravity is determined by the likelihood of the occurrence of the event against which a standard is directed; the severity of the illness or injury if the event has occurred or was to occur; and the number of persons potentially affected if the event has occurred or were to occur.

Table XI—Gravity: Likelihood

| Likelihood of occurrence | Penalty Points |
|---|---|
| No likelihood | 0 |
| Unlikely | 10 |
| Reasonably likely | 30 |
| Highly likely | 40 |
| Occurred | 50 |

Table XII—Gravity: Severity

| Severity of injury or illness if the event has occurred or were to occur | Penalty Points |
|---|---|
| No lost work days (All occupational injuries and illnesses as defined in 30 CFR Part 50 except those listed below.) | 0 |
| Lost work days or restricted duty (Any injury or illness which would cause the injured or ill person to lose one full day of work or more after the day of the injury or illness, or which would cause one full day or more of restricted duty.) | 5 |
| Permanently disabling (Any injury or illness which would be likely to result in the total or partial loss of the use of any member or function of the body.) | 10 |
| Fatal (Any work-related injury or illness resulting in death, or which has a reasonable potential to cause death.) | 20 |

Table XIII—Gravity: Persons Potentially Affected

| Number of persons potentially affected if the event has occurred or were to occur | Penalty Points |
|---|---|
| 0 | 0 |
| 1 | 1 |
| 2 | 2 |
| 3 | 4 |
| 4 | 6 |
| 5 | 8 |
| 6 | 10 |
| 7 | 12 |
| 8 | 14 |
| 9 | 16 |
| 10 or more | 18 |

(f) Demonstrated good faith of the operator in abating the violation. This criterion provides a 10% reduction in the penalty amount of a regular assessment where the operator abates the violation within the time set by the inspector.

(g) Penalty conversion table. The penalty conversion table is used to convert the total penalty points to a dollar amount.

Table 14 to Paragraph (g) - Penalty Conversion Table

TABLE XIV—PENALTY CONVERSION TABLE

| Points | Penalty ($) |
|---|---|
| 60 or fewer | $139 |
| 61 | 152 |
| 62 | 163 |
| 63 | 177 |
| 64 | 192 |
| 65 | 208 |
| 66 | 225 |
| 67 | 245 |
| 68 | 264 |
| 69 | 286 |
| 70 | 310 |
| 71 | 336 |
| 72 | 365 |
| 73 | 395 |
| 74 | 428 |
| 75 | 463 |

Add.26

### TABLE XIV—PENALTY CONVERSION TABLE— Continued

| Points | Penalty ($) |
|---|---|
| 76 | 504 |
| 77 | 542 |
| 78 | 589 |
| 79 | 638 |
| 80 | 692 |
| 81 | 749 |
| 82 | 810 |
| 83 | 879 |
| 84 | 952 |
| 85 | 1,033 |
| 86 | 1,118 |
| 87 | 1,210 |
| 88 | 1,311 |
| 89 | 1,421 |
| 90 | 1,539 |
| 91 | 1,667 |
| 92 | 1,805 |
| 93 | 1,955 |
| 94 | 2,119 |
| 95 | 2,295 |
| 96 | 2,486 |
| 97 | 2,692 |
| 98 | 2,918 |
| 99 | 3,161 |
| 100 | 3,425 |
| 101 | 3,709 |
| 102 | 4,018 |
| 103 | 4,353 |
| 104 | 4,715 |
| 105 | 5,109 |

TABLE XIV—PENALTY CONVERSION TABLE—
Continued

| Points | Penalty ($) |
|---|---|
| 106 | 5,534 |
| 107 | 5,995 |
| 108 | 6,494 |
| 109 | 7,035 |
| 110 | 7,621 |
| 111 | 8,253 |
| 112 | 8,943 |
| 113 | 9,688 |
| 114 | 10,496 |
| 115 | 11,369 |
| 116 | 12,315 |
| 117 | 13,342 |
| 118 | 14,453 |
| 119 | 15,657 |
| 120 | 16,960 |
| 121 | 18,374 |
| 122 | 19,902 |
| 123 | 21,561 |
| 124 | 23,358 |
| 125 | 25,300 |
| 126 | 27,409 |
| 127 | 29,693 |
| 128 | 32,165 |
| 129 | 34,844 |
| 130 | 37,747 |
| 131 | 40,891 |
| 132 | 44,295 |
| 133 | 47,984 |
| 134 | 51,812 |
| 135 | 55,638 |
| 136 | 59,468 |
| 137 | 63,292 |
| 138 | 67,121 |
| 139 | 70,947 |
| 140 or more | 74,775 |

(h) The effect of the penalty on the operator's ability to continue in business. MSHA presumes that the operator's ability to continue in business will not be affected by the assessment of a civil penalty. The operator may, however, submit information to the District Manager concerning the financial status of the business. If the information provided by the operator indicates that the penalty will adversely affect the operator's ability to continue in business, the penalty may be reduced.

[72 FR 13635, Mar. 22, 2007, as amended at 73 FR 7209, Feb. 7, 2008; 81 FR 43455, July 1, 2016; 82 FR 5383, Jan. 18, 2017; 83 FR 14, Jan. 2, 2018; 84 FR 219, Jan. 23, 2019; 85 FR 2299, Jan. 15, 2020; 86 FR 2970, Jan. 14, 2021; 87 FR 2336, Jan. 14, 2022]

**30 C.F.R. § 100.7**

§ 100.7 Notice of proposed penalty; notice of contest.

(a) A notice of proposed penalty will be issued and served by certified mail, or the equivalent, upon the party to be charged and by regular mail to the representative of miners at the mine after the time permitted to request a conference under § 100.6 expires, or upon the completion of a conference, or upon review by MSHA of additional information submitted in a timely manner.

(b) Upon receipt of the notice of proposed penalty, the party charged shall have 30 days to either:

(1) Pay the proposed assessment. Acceptance by MSHA of payment tendered by the party charged will close the case.

(2) Notify MSHA in writing of the intention to contest the proposed penalty. When MSHA receives the notice of contest, it advises the Federal Mine Safety and Health Review Commission (Commission) of such notice. No proposed penalty which has been contested before the Commission shall be compromised, mitigated or settled except with the approval of the Commission.

(c) If the proposed penalty is not paid or contested within 30 days of receipt, the proposed penalty becomes a final order of the Commission and is not subject to review by any court or agency.





Thursday,
March 22, 2007

Part IV

Department of Labor

Mine Safety and Health Administration

30 CFR Part 100
Criteria and Procedures for Proposed
Assessment of Civil Penalties; Final Rule

| | |
|---|---|
| Over 30,000 to 60,000 | 3 |
| Over 60,000 to 100,000 | 4 |
| Over 100,000 to 200,000 | 5 |
| Over 200,000 to 300,000 | 6 |
| Over 300,000 to 500,000 | 7 |
| Over 500,000 to 700,000 | 8 |
| Over 700,000 to 1 million | 9 |
| Over 1 million | 10 |

| Annual hours worked at all mines | Final Rule Penalty Points |
|---|---|
| 0 to 5,000 | 0 |
| Over 5,000 to 7,000 | 2 |
| Over 7,000 to 10,000 | 4 |
| Over 10,000 to 20,000 | 6 |
| Over 20,000 to 30,000 | 8 |
| Over 30,000 to 50,000 | 10 |
| Over 50,000 to 70,000 | 12 |
| Over 70,000 to 100,000 | 14 |
| Over 100,000 to 200,000 | 16 |
| Over 200,000 to 300,000 | 18 |
| Over 300,000 to 500,000 | 20 |
| Over 500,000 to 700,000 | 22 |
| Over 700,000 to 1,000,000 | 24 |
| Over 1,000,000 | 25 |

(c) History of Previous Violations

Final § 100.3(c) is derived from existing § 100.3(c). Final § 100.3(c), like the proposed rule, provides that an operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Final § 100.3(c) clarifies that the repeat aspect of the history criterion in paragraph (c)(2) applies to operators only after an operator has received 10 violations, and to independent contractor operators only after an independent contractor has received 6 violations. In addition, only assessed violations that have been paid or finally adjudicated, or have become final orders of the Federal Mine Safety and Health Review Commission (Commission), will be included in determining an operator's history.

Proposed § 100.3(c) clarified the existing provision by adding the phrase "or have become final orders of the Commission" in the second sentence of this paragraph to reflect MSHA's intent that only violations which have become final be included in an operator's history. In addition, the proposal made several substantive changes to existing § 100.3(c). An operator's history of violations under existing § 100.3(c) was based solely on the overall number of violations cited against an operator during a preceding 24-month period. Under the proposal, the period of time would be shortened to 15 months and an operator's history of violations would include two components: the total number of violations and the number of repeat violations in that 15-month period.

MSHA received numerous comments with respect to these proposed changes. Several commenters opposed the 15-month period. These commenters expressed concern that the proposed 15-month period would deprive MSHA of critical information about an operator's past safety record, particularly for aggregate mining operations that are seasonal or intermittent, and could result in lower penalties, particularly for repeat violators. One commenter criticized MSHA for not publishing data that the Agency used to determine that the effect of the shorter time period would have a negligible effect on an independent contractor's history. On the other hand, many commenters supported the shorter time period because it provided a more current or

**13604**    **Federal Register** / Vol. 72, No. 55 / Thursday, March 22, 2007 / Rules and Regulations

more realistic indication of an operator's compliance.

MSHA has determined that the proposed 15-month period will provide the Agency with sufficient data to accurately evaluate an operator's compliance record, including any trend, even for mining operations that are inspected on a less-frequent basis, e.g., seasonal or intermittent operations. MSHA reviewed violations that were assessed in 2005 and determined that because it takes approximately three months for a penalty assessment to become a final order of the Commission, the proposed 15-month period would provide the Agency with at least one full year of data for coal and metal and nonmetal operations, and for independent contractors.

The shortened timeframe of 15 months provides MSHA with a more recent compliance history than the 24-month period under the existing rule. In addition, MSHA believes that operators who violate the Mine Act and MSHA's health and safety standards and regulations should receive penalties for those violations as close as practicable to the time the violation occurs in order to provide a more appropriate incentive for changing compliance behavior.

For coal and metal and nonmetal operations, the data would be normalized by the amount of inspection time resulting in data comparable to that of the 24-month period under the existing rule. MSHA analyzed the data for operator violations that were assessed in 2005 to determine the impact of changing to a 15-month period. For coal and metal and nonmetal operator violations that were assigned history penalty points in 2005, and had a minimum of 10 violations during the 15-month period, the average penalty points using a preceding 24-month period was 7.5 per violation. Using a preceding 15-month period, the average was 7.6 penalty points per violation.

For independent contractors, there is a negligible difference between calculating an independent contractor's history of violations under the proposed rule and under the existing rule. This is so because it generally takes up to three months for a violation to become a final order and, therefore, the 15-month period provides MSHA with at least one full year of data from which to calculate violation history. MSHA reviewed violations that were assessed in 2005, which show that there were 3,844 contractors that were issued at least one citation in the 24-month period from January 1, 2004 to December 31, 2005. Using the same number of months and the annualized calculation that is used

to determine violation history in the existing rule, these contractors were issued an average of 2.3 violations per year with a median of one violation per year during this time frame. Using the 15-month period without annualizing the number of violations as proposed, these same contractors were issued an average of 2.9 violations with a median of one violation during the 15-month period between October 1, 2004 and December 31, 2005.

Several commenters expressed concern with the Agency's proposal to use violations that have become final orders of the Commission, stating that this will encourage operators to increase penalty contests to avoid counting the violation in an operator's history. MSHA included the insertion of the phrase "final orders of the Commission" to clarify the Agency's practice, in existence since 1982, to use only violations that have become final orders of the Commission in determining an operator's history of violations. This practice will continue to provide a measure of fairness by not including in an operator's history those violations that are in the adjudicatory process which may ultimately be dismissed or vacated. As each penalty contest becomes final, however, the violation will be included in an operator's history as of the date it becomes final.

In consideration of all comments, final § 100.3(c) retains the final order language and shortens the period of time from 24 to 15 months for determining an operator's history of violations as proposed.

Several commenters expressed confusion regarding the number of violations that would trigger application of the repeat violation provision in proposed paragraph (c)(2). MSHA intends that the repeat violation provision in final paragraph (c)(2) would only apply to contractors after an operator has received 10 violations, and to independent contractor operators only after an independent contractor has received 6 violations. Therefore, final § 100.3(c) includes clarifying language.

Final § 100.3(c)(1) is a new paragraph derived from existing § 100.3(c). Final § 100.3(c)(1), like the proposed rule, provides that history penalty points are assigned on the basis of the number of violations per inspection day (VPID) for coal operations and metal and nonmetal operations. Under final paragraph (c)(1), penalty points are not assigned to coal operations and metal and nonmetal operations that receive fewer than 10 violations in a preceding 15-month period. For independent contractors, final § 100.3(c)(1), like the proposed rule, provides that penalty points are

assigned on the basis of the total number of violations at all mines. Penalty points are not assigned to independent contractors with fewer than 6 violations. The maximum number of points that an operator may receive for this criterion is 25 points.

Most commenters supported the proposed continuation of using VPID to calculate points for coal and metal and nonmetal operator's history of violations, stating that VPID provides the truest measure of an operator's compliance. Some of these commenters, however, requested that MSHA clarify its definition of an inspection day. These commenters stated that MSHA's method of determining inspection days is different between coal mines and metal and nonmetal mines, which affects how points are computed.

MSHA's definition of VPID (Violations per Inspection Day) is calculated by taking the total number of assessed violations at a mine for a specified period that have either been paid or have become a final order of the Commission and dividing it by the total number of inspection days at the mine during the same specified period. There is no functional difference between a violation that an operator pays and a final order of the Commission.

Prior to April 2005, MSHA used different definitions of an inspection day for coal and metal and nonmetal mines. For coal mines, each mine visit by each Authorized Representative of the Secretary (AR) was considered a separate inspection day. For metal and nonmetal mines, the total time for each inspection event was divided by five hours to determine the number of inspection days for that event. For both coal and metal and nonmetal operations, the number of inspection days were then summed for the specified period. In April 2005, MSHA began its transition to use the per-visit method previously used only for coal mines for all types of mines. MSHA currently calculates inspection days for assessment purposes by counting one inspection day for each AR that spends any on-site inspection time during any calendar day. Supervisory and trainee time is excluded from the inspection day calculation as are non-inspection activities. The same method is used for all coal, metal, and nonmetal mines.

Some commenters expressed concern that the proposed new provision that history penalty points not be assigned to coal operations and metal and nonmetal operations with fewer than 10 violations in a preceding 15-month period essentially amounted to a free pass for small mines and constituted selective enforcement of the Mine Act. MSHA

projects that this new provision would work similar to existing § 100.4(b), which excludes from excessive history mines having 10 or fewer assessed violations in a preceding 24-month period. In making a decision to include the new provision in the proposed rule, MSHA considered various factors, such as small, seasonal, and intermittent operations, all of which may result in an operation having a low number of inspection days during the specified period. For such operations, even though the total number of violations may be low, i.e., three violations in a preceding 15-month period, the VPID could easily be greater than the highest VPID level, or 2.1, and the operator would receive the maximum number of 25 points. To avoid the inequitable result of subjecting any mining operation with only a few violations in a preceding 15-month period to an unrealistically high VPID, MSHA concludes that the new provision, under which penalty points are not assigned to coal operations and metal and nonmetal operations with fewer than ten violations in a preceding 15-month period, is necessary. Therefore, the final rule includes the proposed language.

Several commenters suggested, as an alternative to the proposal, that the final rule include a provision that history penalty points not be assigned to independent contractors with fewer than 10 violations in a preceding 15-month period. In considering this suggestion, MSHA reviewed its violation data which showed that between October 1, 2004 and December 31, 2005, approximately 500 contractors would have received history penalty points for 6 or more violations during a 15-month period. This number would

be reduced, however, to approximately 200 if contractors with fewer than 10 violations were not assessed history points. Stated differently, under MSHA's violation data, 11% of the independent contractor violations would have received history penalty points for six or more violations during a previous 15-month period. This percentage would be reduced, however, to approximately 6% if contractors with fewer than 10 violations were not assessed history points. Although there was strong support for the suggested alternative, MSHA has decided that the alternative does not further the purpose of this rulemaking and that the Agency will retain the proposed language that penalty points not be assigned to independent contractors with fewer than 6 violations in a preceding 15-month period.

MSHA specifically requested comments as to whether the Agency should adopt the proposed approach for calculating an independent contractor's history of violations by using the total number of assessed violations at all mines during a preceding 15-month period, or whether the Agency should use an annualized 2-year average as it does under the existing rule. Under the existing rule, the number of violations for independent contractors is based on an annual average of all violations over a two year period at all mines. MSHA received several comments expressing skepticism with the Agency's statement that only a minimal increase in the average assessment issued to independent contractors would result by eliminating the annualized average. In addition, some commenters suggested that MSHA use VPIDs when computing contractor history. These commenters

stated that contractors are required to have a single MSHA contractor ID number for nationwide operations, and that if working daily at multiple mine sites across the country, that contractor is likely to be inspected far more frequently than the average mine operator. These commenters concluded that MSHA's proposal lacks an adequate foundation and results in unfair treatment of independent contractors.

VPID cannot be used to calculate a contractor's history of violations because MSHA does not record inspection time for contractors. As explained above, MSHA tracks contractor violations by counting total violations within a specified period. Although MSHA received some comments critical of the proposed method, it has proved to be both successful and practical in calculating a contractor's violation history under the existing rule.

The proposed rule increased the maximum number of points under this criterion from 20 under the existing regulation to 25 points. The final rule retains the proposed 25 maximum points; however, MSHA raised penalty points for independent contractors with 8 to 50 violations during the previous 15-month period, relative to what was proposed. The additional increase in points reflects MSHA's desire to increase points for independent contractors so as to reduce the discrepancy in penalties between operators and independent contractors.

Tables II–6 and II–7 compare the existing and final penalty point scales for coal and metal and nonmetal operators and independent contractors.

13606     Federal Register / Vol. 72, No. 55 / Thursday, March 22, 2007 / Rules and Regulations

Table II-6 -- History of Previous Violations: Mine Operators

| Violations per inspection day | Existing Rule Penalty Points |
|---|---|
| 0 to 0.3 | 0 |
| Over 0.3 to 0.5 | 2 |
| Over 0.5 to 0 7 | 4 |
| Over 0.7 to 0.9 | 6 |
| Over 0.9 to 1.1 | 8 |
| Over 1.1 to 1.3 | 10 |
| Over 1.3 to 1.5 | 12 |
| Over 1.5 to 1.7 | 14 |
| Over 1.7 to 1.9 | 16 |
| Over 1.9 to 2.1 | 18 |
| Over 2.1 | 20 |

| Mine Operator's Overall History of Violations Per Inspection Day | Final Rule Penalty Points |
|---|---|
| 0 to 0.3 | 0 |
| Over 0.3 to 0.5 | 2 |
| Over 0.5 to 0 7 | 5 |
| Over 0.7 to 0.9 | 8 |
| Over 0.9 to 1.1 | 10 |
| Over 1.1 to 1.3 | 12 |
| Over 1.3 to 1.5 | 14 |
| Over 1.5 to 1.7 | 16 |
| Over 1.7 to 1.9 | 19 |
| Over 1.9 to 2.1 | 22 |
| Over 2.1 | 25 |

**Federal Register**/Vol. 72, No. 55/Thursday, March 22, 2007/Rules and Regulations    **13607**

Table II-7 -- History of Previous Violations: Independent Contractors

| Number of violations | Existing Rule Penalty Points |
|---|---|
| 0 to 5 | 0 |
| Over 5 to 10 | 2 |
| Over 10 to 15 | 4 |
| Over 15 to 20 | 6 |
| Over 20 to 25 | 8 |
| Over 25 to 30 | 10 |
| Over 30 to 35 | 12 |
| Over 35 to 40 | 14 |
| Over 40 to 45 | 16 |
| Over 45 to 50 | 18 |
| Over 50 | 20 |

| Independent Contractor's Overall History of Number of Violations | Final Rule Penalty Points |
|---|---|
| 0 to 5 | 0 |
| 6 | 1 |
| 7 | 2 |
| 8 | 3 |
| 9 | 4 |
| 10 | 5 |
| 11 | 6 |
| 12 | 7 |
| 13 | 8 |
| 14 | 9 |
| 15 | 10 |
| 16 | 11 |
| 17 | 12 |
| 18 | 13 |
| 19 | 14 |
| 20 | 15 |
| 21 | 16 |
| 22 | 17 |
| 23 | 18 |
| 24 | 19 |
| 25 | 20 |
| 26 | 21 |
| 27 | 22 |
| 28 | 23 |
| 29 | 24 |
| Over 29 | 25 |

In the proposal, the Agency added a new component to the history criterion to target operators who allowed the same violations to recur, without correcting the underlying root cause. The new § 100.3(c)(2), like the proposal,

Add.35

**13608**    **Federal Register** / Vol. 72, No. 55 / Thursday, March 22, 2007 / Rules and Regulations

adds repeat violations of the same citable provision of a standard to an operator's history of violations and could account for a maximum of 20 penalty points. Under the final rule, an operator would not receive repeat penalty points until that operator had a minimum of 6 repeat violations in a preceding 15-month period.

In response to MSHA's request for comments on this proposal, many commenters opposed it because they believed that it counted some violations twice, once in the overall violation history and again in the repeat violation category, merely for the purpose of increasing penalties. In addition, some of these commenters stated that MSHA's many broad performance-oriented standards are sometimes applied to multiple conditions that are in reality, quite different and that, in these circumstances, operators would be unfairly penalized for repeat violations which were intended to cover only the same or similar conditions. Also, some commenters expressed concern that increased penalties for repeat violations would be unfair in situations in which an MSHA inspector issues multiple citations for multiple violations of the same hazard.

Although some commenters opposed the repeat violation provision as being unfair and redundant, other commenters supported it. MSHA believes that this new provision is consistent with and responsive to Congress's desire to curb repeat violations. Reporting on the bill that became the Mine Act, the Senate Committee on Human Resources stated:

In evaluating the history of the operator's violations in assessing penalties, it is the intent of the Committee that repeated violations of the same standard, particularly within a matter of a few inspections, should result in the substantial increase in the amount of the penalty to be assessed. Seven or eight violations of the same standard within a period of only a few months should result, under the statutory criteria, in an assessment of a penalty several times greater than the penalty assessed for the first such violation.

S. Rep. No. 95–181, at 43.

MSHA analyzed violation data for the 15-month period from January 1, 2005, through March 31, 2006. These data showed that often inspectors issued citations for the same safety and health hazards at the same operation within a specified period of time. From these data, the Agency concludes that once a condition is identified, these operators are correcting that particular condition without addressing the root cause of the problem. This new provision is aimed at preventing these types of occurrences and thereby providing a systematic

improvement to miner safety and health.

Some of the commenters who supported the proposed repeat violation provision expressed concern that it was too narrowly construed because it only counted violations of the same subsection of an MSHA standard. One commenter provided the example that violations for combustible materials under 30 CFR 75.400 should not be dissected into the specific nature of the combustible material, i.e., paper, coal dust, wood, etc., when considering repeat status. Another commenter suggested, as an alternative, that MSHA retain its discretion to use broader categories of violations of standards in determining whether a company is a repeat violator.

MSHA does not agree that the repeat provision should include broader categories of violations. MSHA analyzed violation data for the 15-month period from January 1, 2005, through March 31, 2006. MSHA's analysis, interpreting "same standard" to mean "same citable provision," showed that 698 of the 10,227 mines with violations had at least 6 violations of the same citable provision of a standard. Further, 99 of the 698 mines had more than 20 violations of the same citable provision during the 15-month period. Limiting repeat violations to the same citable provision targets those operators who show a repeated lack of commitment to miner safety and health; this is precisely the type of behavior that the Agency seeks to change.

MSHA specifically requested comments on whether, in determining penalty points for repeat violations, the Agency should factor in the number of inspection days during which the repeat violations were cited.

Several commenters opposed factoring in the number of inspection days when counting violations under this provision. Most commenters, however, supported using repeat violations per inspection day (RPID) to calculate repeat violations. These commenters expressed concern that operators of large mines generally receive more violations than smaller mines solely because larger mines have a greater number of inspections and, therefore, calculating repeat violations using RPID would provide a level of fairness missing from the proposed rule. The application of RPID to the new repeat provision would account for increased inspector presence in large mines and would place all mines on a more equitable basis. Therefore, this final rule incorporates a new repeat violations table which applies RPID to the calculation for coal and metal and

nonmetal operations. Under this table, repeat points apply only where there have been a minimum of 6 repeat violations. In addition, for the same reasons as stated previously, MSHA will not apply the repeat criterion until a coal and metal and nonmetal operator has received a minimum of 10 violations within a preceding 15-month period.

RPID cannot be used to calculate repeat violations for independent contractors because MSHA does not record inspection time for contractors. Therefore, the final rule, like the proposed rule, uses the total number of violations in a 15-month period for establishing repeat violation history for independent contractors. Although MSHA received some comments critical of the proposal with respect to independent contractors, the Agency's historical method of calculating history for independent contractors has proved to be both successful and practical.

The final rule revises the proposed table for repeat violations for independent contractors by raising the penalty points for contractors with 6 to 20 repeat violations during the previous 15-month period. Under the final rule, an independent contractor will receive the maximum 20 points for 15 or more repeat violations during the previous 15-month period. These revisions reflect MSHA's desire to increase points for independent contractors, so as to reduce the discrepancy in penalties between operators and independent contractors. The final rule, therefore, retains the proposed provision for repeat violations for independent contractors.

MSHA requested comments on whether all violations should be used to calculate repeat violations, or whether only S&S violations should be used. Many commenters stated it is unfair to count non-S&S violations in the repeat violations provision because it would subject operators to significantly higher penalties for repeated violations that have little or nothing to do with miner safety and health, such as repeated violations of paperwork standards or merely technical violations.

Other commenters, however, stated that MSHA should look at all violations, including non-S&S citations, in calculating penalties for repeat violations because even non-S&S violations can adversely affect miner safety and health. MSHA agrees. The final rule includes all violations, both S&S and non-S&S, in the calculation of repeat violation history. Even though the violations that were assessed in 2005 show that two-thirds of all violations were non-S&S violations, non-S&S violations of technical

standards and low-gravity violations have the potential to pose a health or safety danger to miners. By excluding non-S&S violations from this provision, MSHA would not be taking a proactive approach to advancing miner safety and health; non-S&S violations can lead to S&S violations and even greater hazards to miners. In addition, including non-S&S violations would be consistent with Congress's intent that penalties must provide an effective deterrent against all offenders, and particularly against offenders with records of past violations, regardless of whether they are S&S or non-S&S.

Some commenters who opposed the proposed repeat violation provision stated that, if the provision is adopted, MSHA should avoid retroactive application of the provision by not including violations that occurred before promulgation of the final rule.

These commenters stated that, had they known that violations that occurred prior to the final rule could be used to trigger significantly higher penalties, they would have contested those violations to avoid inclusion under the repeat violations provision. Final paragraph (c)(2) does not apply the repeat violation provision retroactively. The repeat violation provision under paragraph (c)(2), like the total number of violations provision under paragraph (c)(1), imposes higher penalties for violations that occur after publication of this final rule. MSHA, however, has the authority to consider violations which occurred before promulgation of this final rule as part of an operator's history of violations, when determining penalties for violations that occur after issuance of the final rule. In taking this action, MSHA would not be impairing operator rights, increasing an operator's

liability for past violations, or imposing new duties with respect to violations that have already occurred. Rather, MSHA would be taking past violations into consideration in determining a penalty for a violation that occurred after promulgation of this final rule. MSHA, however, plans to pay particular attention to any circumstances resulting in an unfair penalty increase. Under such circumstances, MSHA may process the violation under the special assessment provision to determine a more appropriate penalty.

Penalty points for the number of repeat violations for coal and metal and nonmetal operations are presented in Table II–8. Penalty points for the number of repeat violations for independent contractors are presented in Table II–9.

Table II-8 -- History of Previous Violations-Repeat Violations Coal and Metal and Nonmetal Operators with a Minimum of 6 Repeated Violations

| Number of Repeat Violations Per Inspection Day | Final Rule Penalty Points |
|---|---|
| 0 to 0.01 | 0 |
| Over 0.01 to 0.015 | 1 |
| Over 0.015 to 0.02 | 2 |
| Over 0.02 to 0.025 | 3 |
| Over 0.025 to 0.03 | 4 |
| Over 0.03 to 0.04 | 5 |
| Over 0.04 to 0.05 | 6 |
| Over 0.05 to 0.06 | 7 |
| Over 0.06 to 0.08 | 8 |
| Over 0.08 to 0.10 | 9 |
| Over 0.10 to 0.12 | 10 |
| Over 0.12 to 0.14 | 11 |
| Over 0.14 to 0.16 | 12 |
| Over 0.16 to 0.18 | 13 |
| Over 0.18 to 0.20 | 14 |
| Over 0.20 to 0.25 | 15 |
| Over 0.25 to 0.3 | 16 |
| Over 0.3 to 0.4 | 17 |
| Over 0.4 to 0.5 | 18 |
| Over 0.5 to 1.0 | 19 |
| Over 1.0 | 20 |

Table II-9 -- History of Previous Violations: Repeat Violations for Independent Contractors.

| Number of Repeat Violations of the Same Standard | Final Rule Penalty Points |
|---|---|
| 5 or fewer | 0 |
| 6 | 2 |
| 7 | 4 |
| 8 | 6 |
| 9 | 8 |
| 10 | 10 |
| 11 | 12 |
| 12 | 14 |
| 13 | 16 |
| 14 | 18 |
| More than 14 | 20 |

Add.38