No. 22-1143

---

**THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

GMS MINE REPAIR

Petitioner

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION;
SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION

Respondents

---

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

---

Brief for the Secretary of Labor, MSHA

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

ROBERT S. WILSON
Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
201 12th Street, South
Suite 401
Arlington, VA 22202
Telephone: 202-693-9389
Wilson.robert.s@dol.gov

## STATEMENT REGARDING ORAL ARGUMENT

The Secretary does not request oral argument as he believes oral argument is not necessary to assist the Court in deciding this case. However, the Secretary does not oppose the Company's request for oral argument.

## TABLE OF CONTENTS

STATEMENT REGARDING JURISDICTION ........................................................1

STATEMENT OF THE ISSUES .........................................................................1

STATEMENT OF THE CASE..............................................................................1

   I.    Statutory background .............................................................................1

   II.   MSHA's process for proposing civil penalties ....................................3

   III.  Factual and procedural history ..............................................................8

   IV.  The ALJ's decision..............................................................................10

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT ........................................................................................................15

   I.    Standard of review...............................................................................15

   II.   Section 100.3(c) is ambiguous with regard to when a violation is included in an operator's history of violations. ...............................................15

       A.   Text of the regulation ....................................................................16

       B.   History of the regulation ...............................................................20

       C.   Structure of the Mine Act...............................................................21

       D.   Purpose of the Mine Act and Section 100.3(c) ...........................24

   III.  The Secretary's interpretation of Section 100.3(c) is reasonable. .............25

   IV.  The Secretary's interpretation of §100.3(c) is entitled to deference...........28

       A.   Authoritative or official position................................................29

       B.   Substantive expertise....................................................................30

       C.   Fair and considered judgment ......................................................31

       D.   Agency intent ................................................................................31

   V.   The ALJ committed no material factual errors. ...........................................32

CONCLUSION.....................................................................................................36

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Coal Co. v. FMSHRC*,
796 F.3d 18 (D.C. Cir. 2015) ............................................................. 15

*Am. Coal Co. v. FMSHRC*,
933 F.3d 723 (D.C. Cir. 2019) ............................................................. 4

*Coal Emp. Project v. Dole*,
889 F.2d 1127 (D.C. Cir. 1989) ......................................................... 24

*Doe v. SEC*,
28 F.4th 1306 (D.C. Cir. 2022) ............................................. 16, 29, 30

*Donovan v. Dewey*,
452 U.S. 594 (1981) ............................................................................. 2

*Hobet Mining Co.*,
26 FMSHRC 890 (Nov. 2004) ........................................................... 34

*Jim Walter Res., Inc. v. Sec'y of Labor*,
103 F.3d 1020 (D.C. Cir. 1997) ...................................................... 6, 29

*KenAmerican Resources v. Secretary of Labor*,
33 F.4th 884 (6th Cir. 2022) ............................................................. 26

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .................................. 15, 16, 25, 29, 30, 31, 32

*Martin v. OSHRC*,
499 U.S. 144 (1991) ........................................................................... 30

*Mullins Coal Co. of Va. v. Director, Office of Workers' Compensation Programs*,
484 U.S. 135 (1987) ........................................................................... 31

*Northshore Mining Company v. Secretary of Labor*,
46 F.4th 718 (8th Cir. 2022) ............................................................. 27

*Secretary of Labor v. Knight Hawk Coal, LLC*,
   991 F.3d 1297 (D.C. Cir. 2021) ............................................................. 16

*Secretary of Labor v. The Am. Coal Co.*,
   38 FMSHRC 1987 (Aug. 2016) ............................................................. 4

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ............................................................................. 2

*Tilden Mining Co., Inc. v. Sec'y of Lab.*,
   832 F.3d 317 (D.C. Cir. 2016) ............................................................. 28

*Union 1261, Dist. 22, UMWA v. FMSHRC*,
   917 F.2d 42 (D.C. Cir. 1990) ....................................................... 28, 36

**Statutes**

30 U.S.C. 801(a) ..................................................................................... 1

30 U.S.C. 801(c) ..................................................................................... 2

30 U.S.C. 811 and 813 ............................................................................ 2

30 U.S.C. 813(a) ..................................................................................... 27

30 U.S.C. 814(a) ..................................................................................... 19

30 U.S.C. 814(b) ..................................................................................... 7

30 U.S.C. 814(a), (d) .............................................................................. 2

30 U.S.C. 814(d) ..................................................................................... 7

30 U.S.C. 815 .......................................................................................... 2

30 U.S.C. 815(a), 820(a) ............................................... 2, 4, 7, 21, 22, 35

30 U.S.C. 816(a)(1) ................................................................................. 3

iv

30 U.S.C. 817(a) ................................................................ 7

30 U.S.C. 820(b)(2)............................................................ 27

30 U.S.C. 820(i) ....................................................... 3, 4, 11

30 U.S.C. 823(d) ........................................................... 2, 22

30 U.S.C. 823(d)(1)......................................................... 2, 3

## Regulations

29 C.F.R. Part 2700............................................................ 4

29 C.F.R. 2700.28(a).................................................... 21, 35

29 C.F.R. 2700.50-78 ........................................................ 22

30 C.F.R. Part 70............................................................... 23

30 C.F.R. Part 100.............................................................. 4

30 C.F.R. 100.3 ................................................................. 5

30 C.F.R. 100.3(a)(1) ...................................................... 3, 4

30 C.F.R. 100.3(c)....................... 4, 5, 6, 9, 22, 24, 25, 27, 32, 33, 37, 38

30 C.F.R. 100.7(a)............................................................. 4

30 C.F.R. 75.402-403 ........................................................ 22

*Criteria and Procedures for Proposed Assessment of Civil Penalties*,
   72 Fed. Reg. 13,592 (Mar. 22, 2007)..................... 6, 11, 20, 21, 22, 25, 26, 27, 31

## Other Authorities

S. Rep. No. 95-181 ............................................................ 3

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| Commission | Federal Mine Safety and Health Review Commission |
| GMS | GMS Mine Repair |
| JA | Joint Appendix |
| Judge | Administrative Law Judge |
| MSHA | Mine Safety and Health Administration |
| PPM | MSHA Program Policy Manual |
| PDR | Petition for Discretionary Review |
| Preamble | *Criteria and Procedures for Proposed Assessment of Civil Penalties*, 72 Fed. Reg. 13,592, (Mar. 22, 2007) |
| Secretary | Secretary of Labor |

## STATEMENT REGARDING JURISDICTION

GMS's jurisdictional statement is accurate.

## STATEMENT OF THE ISSUES

1. Whether Section 100.3(c) is ambiguous with regard to when a violation is included in an operator's history of violations.

2. Whether the Secretary's interpretation of the regulation is reasonable.

3. Whether the Secretary's interpretation—which is embodied in the preamble to the regulation and in MSHA's official guidance documents, and has been in effect since 2007—merits deference.

4. Whether any of the ALJ's alleged factual errors are immaterial.

## STATEMENT OF THE CASE

### I.    Statutory background

The Federal Mine Safety and Health Act of 1977 ("Mine Act" or "Act") was enacted to improve and promote safety and health in all the Nation's mines. 30 U.S.C. §801(a). In enacting the Mine Act, Congress stated, inter alia, that "there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm, and in order to prevent occupational

1

diseases originating in such mines." 30 U.S.C. §801(c); *see Donovan v. Dewey*, 452 U.S. 594, 602 n.7 (1981).

The Mine Act authorizes the Secretary of Labor, acting through the Mine Safety and Health Administration ("MSHA"), to promulgate mandatory health and safety standards for the Nation's mines and to conduct regular inspections of those mines. 30 U.S.C. §§ 811 and 813. If inspectors discover a violation of the Act or a standard, they are authorized to issue a citation or an order. 30 U.S.C. §§814(a), (d). For each violation, MSHA must propose a civil penalty. 30 U.S.C. §§815(a), 820(a).

An operator may contest a citation, order, or proposed penalty before the Commission. 30 U.S.C. §815. The Commission is an independent adjudicatory agency established under the Mine Act to provide administrative trial-type proceedings and appellate review in cases arising under the Act. 30 U.S.C. §823(d). *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 204 (1994). If an operator does not contest a citation, order, or proposed penalty within 30 days of receiving it, it is deemed a final order of the Commission not subject to review. 30 U.S.C. §815(a). If an operator does contest citations, orders, and penalties, those are assigned to a Commission ALJ for a hearing. 30 U.S.C. §823(d)(1). Any person adversely affected or aggrieved by an ALJ's decision may file a PDR with the Commission.

If the Commission declines to grant a PDR or otherwise direct review, the ALJ's decision becomes the final decision of the Commission 30 days after it is issued. 30 U.S.C. §823(d)(1). Any person adversely affected or aggrieved by a Commission decision may file a petition for review with an appropriate Court of Appeals. 30 U.S.C. §816(a)(1).

## II.    MSHA's process for proposing civil penalties

Civil penalties are recognized as an important tool in the Mine Act for encouraging compliance with the Act and its regulations by mine operators and assuring the safety of the nation's miners. The Mine Act's legislative history underscores the importance of civil penalties; Congress "firmly believes that the civil penalty is one of the most effective mechanisms for insuring lasting and meaningful compliance with the law." S. Rep. No. 95-181, at 15 (1977).

 In proposing a civil penalty, the Secretary must consider six factors: (1) the operator's history of previous violations, (2) the appropriateness of the penalty to the size of the operator's business, (3) whether the operator was negligent, (4) the effect of the penalty on the operator's ability to continue in business, (5) the gravity of the violation, and (6) the operator's good faith in attempting to achieve rapid compliance after notification of the violation. 30 U.S.C. § 820(i); 30 C.F.R. § 100.3(a)(1).

The process by which a penalty is proposed by the Secretary and assessed by the Commission is governed by 30 C.F.R. Part 100 and the Commission's Rules of Procedure found at 29 C.F.R. Part 2700. Citations and orders are referred from the field to MSHA's Office of Assessments, which, in turn, calculates the proposed penalty and mails the proposed penalty assessment to the operator. 30 U.S.C. §815(a); 30 C.F.R. §100.7(a).

The Mine Act does not provide specific guidance on how MSHA is to calculate any of the statutory penalty criteria; it simply lists the criteria to be included in MSHA's penalty determination. The Secretary has promulgated rules explaining the default process for calculating penalties, the regular assessment process: applying a formula to the six statutory penalty criteria. 30 C.F.R. §100.3(a)(1). For regular proposed penalty assessments, "MSHA's Office of Assessments provides operators and, in turn, Judges with an 'Exhibit A' that consists of a penalty report detailing the penalty points assessed under each statutory factor"; the "exhibit provides the operator . . . an explicit explanation of the bases for the proposed penalty." *The Am. Coal Co.*, 38 FMSHRC 1987, 1991 (Aug. 2016), *aff'd, Am. Coal Co. v. FMSHRC*, 933 F.3d 723 (D.C. Cir. 2019).

Pertinently for this case, MSHA's regulations define how an operator's history of violations will be considered for penalty purposes. Those regulations are set forth at 30 C.F.R. §100.3(c).  That provision provides:

4

History of previous violations.  An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history. The repeat aspect of the history criterion in paragraph (c)(2) of this section applies only after an operator has received 10 violations or an independent contractor operator has received 6 violations.

MSHA maintains a database of all citations and orders that are issued to mine operators and contractors. From that database, MSHA determines how many citations and orders are included in an operator's history of violations. When MSHA proposes a penalty for a citation, MSHA looks at the 15-month period preceding the day before the date when the citation was issued. *See* III MSHA, *Program Policy Manual* 97-99, 107 (June 2012), https://arlweb.msha.gov/REGS/COMPLIAN/PPM/PDFVersion/PPM%20Vol%20III.pdf ("PPM").

MSHA does not calculate history of violations based on violations for which citations were *issued* during this 15-month period; MSHA calculates history of violations based on violations that *became final orders* during the period. In the preamble to the final rule, MSHA explained that it has long taken this approach and that this approach promotes fairness:

MSHA included the insertion of the phrase "final orders of the Commission" to clarify the Agency's practice, in existence since 1982, to use only violations that have become final orders of the Commission in determining an operator's history of violations. This

practice will continue to provide a measure of fairness by not including in an operator's history those violations that are in the adjudicatory process which may ultimately be dismissed or vacated. As each penalty contest becomes final, however, the violation *will be included in an operator's history as of the date it becomes final*.

*Criteria and Procedures for Proposed Assessment of Civil Penalties*, 72 Fed. Reg. 13,592, 13,604 (Mar. 22, 2007) (emphasis added).

Likewise, MSHA's Program Policy Manual—which is "the official repository of the Secretary's interpretation of the regulations," *Jim Walter Res., Inc. v. Sec'y of Labor*, 103 F.3d 1020, 1024 (D.C. Cir. 1997)—also makes this procedure clear. The provision addressing § 100.3(c) states: "Overall history is based on the number of citations/orders issued to the mine operator at the applicable mine *that became final orders of the Federal Mine Safety and Health Review Commission (Commission) in the 15 months preceding the occurrence date of the violation being assessed*." PPM 97 (emphasis added). This statement does not refer to citations/orders issued to the mine operator within 15 months but to citations/orders which become final orders of the Commission within the 15 months preceding the violation.

MSHA's decision to calculate history of violations based on when violations become final orders, rather than on when they occur or are cited, is significant

6

because not all violations occur, are cited, and become final orders[1] within 15 months.

This distinction can seem abstract, so consider this example. MSHA issues a citation on July 15, 2022. When MSHA calculates history of violations for the proposed penalty, the relevant 15-month period would be April 15, 2021 – July 14, 2022. MSHA will consider all violations committed by the operator that became final during that 15-month period, regardless of when the violations occurred or were cited.

In sum, when MSHA calculates of an operator's history of violations, it does not matter when the violations occurred or were cited; it matters when the violations became final orders.

---

[1] The term "order" has two distinct meanings under the Mine Act. The first meaning refers to an "order" that is issued by MSHA. See, e.g., 30 U.S.C. §814(b) (failure to abate order), §814(d) (unwarrantable failure order), §817(a) (imminent danger order). The second meaning of the term "order" refers to final orders of the Commission. Whether through an operator not timely contesting a penalty, through settlement, or following litigation and adjudication, the final disposition of a citation or order and penalty is referred to as a "final order of the Commission." 30 U.S.C. §§815(a), 823(d). The regulation refers to this second kind of "order." For ease of reference, this brief will refer to a citation or order issued by MSHA as simply "citation" and will refer to a final order of the Commission as "order" or "final order."

## III.    Factual and procedural history

GMS is a contractor who provides maintenance services at various mines.

GMS was performing services at the Mingo Logan Mountaineer II Mine, an

underground coal mine in Logan County, West Virginia, on April 20 and 27, 2021,

when MSHA issued the five citations involved in this case. (Stipulations 4 and 5)

The citations allege violations of various MSHA standards, including failure to

comply with the mine's approved ventilation plan (Citation 9293663), failure to

maintain electrical cables in safe condition (Citation 9298012), and failure to

maintain equipment brakes in safe operating condition (Citation 9298013). Each of

these citations was designated as significant and substantial, meaning that each of

the cited violations posed at least a reasonable likelihood of causing a serious

injury to one or more miners. (JA ___) MSHA also issued two additional non-S&S

citations to GMS at that time. GMS does not dispute that it committed these

violations or that the three violations were properly designated as significant and

substantial. (Stipulation 12) The Secretary proposed a total civil penalty of

$7,331.00 for the five citations. (JA __)

GMS timely contested the citations and proposed penalties. Before the ALJ,

the parties each filed simultaneous motions for summary decision with detailed

factual stipulations. (JA ___) GMS stipulated to the violations; the gravity

findings, including the three S&S findings; and the findings that it was moderately

negligent in the commission of the violations. (Stipulation 12) The only issue in dispute was the amount of the proposed civil penalties. (Stipulation 13) GMS admitted to five of the statutory penalty criteria but objected to how MSHA calculated the operator's history of violations criterion under §100.3(c). (Stipulation 14)

Four of the five citations were issued on April 20, 2021. For determining GMS's history of violations, MSHA considered the 15-month period from January 20, 2020, through April 19, 2021. The fifth citation was issued on April 27, 2021, and the time period of consideration was from January 27, 2020, through April 26, 2021. (Stipulations 18 and 19) (JA ___) Pursuant to MSHA's long running practice, as articulated in the preamble to the final rule and as set forth in MSHA's Program Policy Manual, MSHA included in GMS's history of violations all violations that became final during those periods.

GMS argued that only citations that were issued during the 15-month period *and* became final during that period should have been included in the operator's history of violations. The substantive effect of this dispute with regard to the five citations at issue is a difference in the number of penalty points assessed for GMS's violation history from 11 points to zero points for the four citations issued on April 20, 2021, and from 10 points to zero points for Citation 9293663 issued

9

on April 27, 2021. The difference in the total penalty would be from $7,331.00 to $3,268.00, or $4,063.00. (Exhibit A; Stips 23, 24 and 25) (JA ___).

## IV.    The ALJ's decision

The ALJ issued his decision on May 13, 2022, granting the Secretary's Motion for Summary Decision and denying the company's Motion for Summary Decision. ALJD 1-6 (JA ___) The ALJ first concluded that there were no factual disputes, that the only dispute concerned a legal issue, and that summary decision was appropriate. The ALJ described the issue as "what precisely gets counted as the operator's violation history in the 15-month period." *Id.* The ALJ identified GMS's argument as "that in order to count towards the operator's history, the violation must have both occurred and been paid, adjudicated, or have become a final order of the Commission during the 15-month period." He identified the Secretary's as that "all citations and orders that have become final in the 15-month period are counted, regardless of when they were issued." *Id.*

The ALJ concluded that the regulation was ambiguous. He stated:

On its face, the regulation is ambiguous and can be read to support either party's position. Based on the language of the regulation, it is unclear if the second sentence is intended to limit the violations mentioned in the first sentence to those that were issued and finalized in the preceding 15-month period, or if it is intended to clarify that the 15-month period is only in reference to the finalization date. Both competing interpretations are reasonable.

*Id.*

10

The ALJ then stated that he would defer to MSHA's interpretation if it was reasonable, and he concluded that it was. In reaching that conclusion, the ALJ considered the preamble to the regulation. The preamble explains, "As each penalty contest becomes final, however, the violation will be included in an operator's history *as of the date it becomes final*." ALJD 5 (quoting 72 Fed. Reg. at 13,604) (emphasis added). Additionally, the ALJ considered MSHA's Program Policy Manual, which states that "Overall history is based on the number of citations/orders issued to the mine operator at the applicable mine that became final orders of the Federal Mine Safety and Health Review Commission (Commission) in the 15 months preceding the occurrence date of the violation being assessed." ALJD 5 (quoting PPM 97) (JA ___).

The ALJ further reasoned that GMS's interpretation of the regulation would lead to absurd results because it would lead to many or most violations issued within the 15-month period not being included in an operator's history of violations, contrary to Congressional intent to consider an operator's history of violations as expressed in Section 110(i) of the Act, 30 U.S.C. § 820(i), and would lead to a perverse incentive for operators to contest citations to reduce their final-order history of violations and penalty amounts. (ALJ Decision page 6) (JA ___)

Although the preamble to the rule discusses that most citations would become final within a few months, in reality citations that are contested often

11

become final only after a lengthy litigation process. The ALJ took note of the Secretary's argument that all of the violations in the then-ten-most recent contested cases listed on the Commission's web site had not become final within the 15-month periods and, under GMS's interpretation of Section 100.3(c), none of the violations in those cases would have been considered in the operator's history of violations.

The Secretary also argued, and the ALJ agreed, that if only violations that were both issued and became final in the 15-month period were included in the violation history calculation, operators would have an incentive to contest all violations to drag out their finality for more than fifteen months, potentially eliminating all violations from consideration in the operator's violation history and, thus, reducing future penalties.

GMS filed a petition for discretionary review with the Commission. The PDR included essentially the same arguments that GMS now makes to this Court. The Commission did not grant GMS's petition for review. GMS has now filed its appeal with this Court.

## SUMMARY OF THE ARGUMENT

Section 100.3(c) is ambiguous as to when a violation is included in an operator's history of violations. The regulation reads, in pertinent part:

> History of previous violations.  An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history.

GMS reads this regulation as stating that only violations that were both cited by MSHA during the 15-month period and became final during that period are properly included in the operator's history. However, the regulation makes no reference to when violations occur or are cited. Rather, it simply references "violations." The second sentence references "assessed violations" that have become final. While GMS reads the first sentence as establishing the relevant violations and the second sentence as limiting them, the Secretary's interpretation is that the first sentence establishes the relevant time period, while the second sentence clarifies what is counted during that time period (final orders). These competing interpretations show ambiguity.

The history of the regulation also shows that it is concerned with finality of violations, not when they occurred or were cited. The preamble does not mention any issue date, and it explains that the focus on finality was MSHA's intent. At the very least, that history shows ambiguity about whether the issue date matters.

The structure of the Mine Act also shows that the regulation is ambiguous. GMS conflates the term "violation" with issued citations. But these are different things, and in many instances, MSHA does not issue a citation or order at the time

13

a violation occurs, for a variety of reasons as discussed below. Moreover, the contest process established in the Mine Act inevitably leads to delays that take many, if not most, contested citations out of the 15-month period; the regulation, which is supposed to capture an accurate history of violations, does not plainly exclude violations just because they are contested and take longer than 15 months to become final.

The Secretary's interpretation of 100.3(c) is reasonable and is entitled to deference. It is consistent with the text, history, and purpose of the regulation. It also is the Secretary's official interpretation: it was clearly explained in the preamble to the rule, is contained in MSHA's Program Policy Manual, and has been consistently applied since 2007. On the other hand, GMS's interpretation would exclude from consideration violations committed by an operator—especially the most serious ones that typically involve more investigation, take longer to be assessed a proposed penalty, and are delayed by litigation—and is contrary to congressional intent that an operator's history of violations be included in penalty determinations. It also would lead to absurd results by incentivizing mine operators to contest every citation and penalty, just to drag out the timeline so that the violations would drop out of the 15-month period.

Finally, the ALJ did not commit any material factual errors.

14

## ARGUMENT

Section 100.3(c) is ambiguous as to when a violation is included in an operator's history of violations, because the regulation does not directly address that question. The Secretary's interpretation of §100.3(c)—that the effective date for inclusion is when the violation becomes final, regardless of when it occurred or when citations were issued for it—is reasonable and is entitled to deference. GMS's proposed interpretation of §100.3(c), in contrast, would defeat the purpose of the Act and would lead to absurd results.

## I.      Standard of review

This Court reviews questions of law de novo, subject to principles of deference. *Am. Coal Co. v. FMSHRC*, 796 F.3d 18, 23-24 (D.C. Cir. 2015). In this case, the Court reviews *de novo* the question of whether Section 100.3(c) is ambiguous and, if so, whether the Secretary has advanced a reasonable interpretation of the regulation that deserves deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

## II.     Section 100.3(c) is ambiguous with regard to when a violation is included in an operator's history of violations.

Courts defer to an agency's interpretation of its "genuinely ambiguous" regulations. *Kisor*, 139 S. Ct. at 2414. "Genuine ambiguity can arise, as the Supreme Court explained, in a variety of circumstances, as when a regulation 'may

prove susceptible to more than one reasonable reading.'" *Doe v. SEC*, 28 F.4th 1306, 1313 (D.C. Cir. 2022) (quoting *Kisor*, 139 S. Ct. at 2410). The Court uses the "traditional tools of construction," including "the text, structure, history, and purpose of a regulation," to decide whether a regulation is ambiguous. *Kisor*, 139 S. Ct. at 2415.

GMS argues that the ALJ did not thoroughly analyze the regulation for plain meaning. GMS Br. 28-35. In fact, the ALJ considered the text, history, and purpose of the regulation. (JA ___). But even if GMS were correct, any error will be corrected by this Court's de novo review of the issue. *See Secretary of Labor v. Knight Hawk Coal, LLC*, 991 F.3d 1297, 1308 (D.C. Cir. 2021) (noting that errors in the Commission's legal analysis can be remedied by the Court's analysis). And the regulation *is* ambiguous, because it is "susceptible to more than one reasonable reading." *Kisor*, 139 S.Ct. at 2410.

## A.    Text of the regulation

The text of the regulation does not clearly explain whether violations must both occur or be cited and become final, or just become final, in the 15-month period. The regulation says nothing about the violations' occurrence or citations' issue date. Although the first sentence refers to a 15-month period for consideration, the sentence does not explicitly state what violations are to be included in that period. The second sentence of §100.3(c) provides that "[o]nly

16

assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history," but the sentence does not say anything about when those final violations must have occurred or when citations for them must have been issued.

The Secretary's interpretation is that the second sentence clarifies, rather than limits, the first. In the Secretary's view, the first sentence establishes the relevant time for considering violations (15 months), and the second clarifies the violations that are to be considered (all those that have become final during that period).

GMS's alleged plain reading of the regulation (that only citations issued and that become final within the 15-month period are counted) is belied by the second sentence's reference to "assessed violations." Whereas the first sentence refers to "violations" in general, the second sentence refers to "assessed violations"; this difference raises a question as to whether "violations" and "assessed violations" are meant to be different and have different dates. Again, §100.3(c) is silent and thus ambiguous on whether the date a violation occurs, the date that it is cited, the date that it becomes an assessed violation or the date that it becomes final is the operative date for inclusion in on operator's violation history.

GMS's textual argument is that the second sentence of the regulation limits, rather than clarifies, the first. In its view, the first sentence limits the pool of

17

eligible violations to all those for which citations were issued in the last 15 months, and the second sentence further limits that pool to only final violations. GMS Br. 21-22. However, that is only one possible reading of the provision. The Secretary's interpretation is that the second sentence clarifies the first. These competing interpretations show ambiguity.

GMS also argues that the regulation says "violations . . . *in* a preceding 15-month period," so it must refer to the citations' issue date. GMS Br. 24. That is, the word *in* necessarily means "violations that were cited in a preceding 15-month period." But that language must be interpreted in light of the next sentence. Under the Secretary's interpretation, the next sentence explains that "violations" means those that have become final. The word *in* still means *in* the 15-month period; it means violations that became final in that period, rather than those that were cited in that period.

GMS argues that if the Secretary meant to include violations that were cited outside a 15-month period that become final in that period, the Secretary should have said so. GMS Br. 24. But under the Secretary's interpretation, the regulation includes both citations issued before and during the 15-month period because the citation issue date is not determinative. The determinative date is when the violation, the citation and the penalty assessment all become final. Thus, there was

18

no need to explain that citations *issued* outside of the 15-month period would be included in the history calculation.

GMS's argument that the regulation has a plain meaning also confuses violations and citations. GMS argues that the regulation considers when citations are issued, GMS Br. 10, 21, but the regulation does not talk about citations. It talks about *violations*. As illustrated by Section 104(a) of the Act, Congress recognized that the terms violation and citation have different meanings:

> If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this Act has *violated* this Act, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this Act, he shall, with reasonable promptness, issue a *citation* to the operator. Each *citation* shall be in writing and shall describe with particularity the nature of the *violation*, including a reference to the provision of the Act, standard, rule, regulation, or order alleged to have been *violated*. In addition, the *citation* shall fix a reasonable time for the abatement of the *violation*.

30 U.S.C. §814(a) (emphasis added). A violation is the condition, act, or practice that violates a provision of the Mine Act or a standard or regulation promulgated pursuant to the Act; a citation is a legal instrument MSHA issues to a mine operator for a violation.

In an attempt to elide this difference, before this Court, GMS argues that a violation as defined by the Mine Act becomes a violation for purposes of this regulation when a citation is issued. GMS Br. 23. No support is provided for this assertion. GMS was less clever before the ALJ; there, it argued that "a *violation*"

must be issued and become final in the 15 months. (Respondent's Motion for Summary Decision P 3.) (JA ___) (emphasis added). GMS's confusion illustrates that the regulation does not plainly mean that either a violation's occurrence date or a citation's issuance date matters.

### B. History of the regulation

When promulgating the current Part 100, the Secretary had to address a number of issues that affected how a mine operator's history of violations would be determined: the time frame to apply for considering an operator's history and as of what time violations would be included; whether to include all violations or limit consideration to violations of the particular standard that was cited in the citation/order that is being assessed; and whether to count violations as of when they were cited or whether to only include those violations once they became final. *See* 72 Fed. Reg. at 13,603-13,605.

The Secretary ultimately decided that only final orders of the Commission would be included in the history computation. As explained in the preamble to the rule, this was done to promote fairness to operators and exclude from consideration citations that may be modified or vacated. 72 Fed. Reg. at 13,604. While the preamble repeatedly emphasizes that the regulation focuses on violations that have become final, it does not discuss at all the violations' occurrence date or citation issue date. *See id.* at 13,603-13,605. The history shows that the regulation is

concerned with finality, not issue date, and at the very least, shows that the regulation is ambiguous about whether issue date matters.

One goal of the regulation was to capture a more recent history than was captured in the previous regulation (15 months versus 24 months). 72 Fed. Reg. at 13,604. As the preamble observes, many violations become final within 15 months, either because they are never contested or because they are contested but settle. *See id.* But the fact that many violations are both cited and final within 15 months does not mean that the regulation plainly includes only that subset of violations. And, as explained below, the most serious violations—the ones whose inclusion in history of violations is especially important—are rarely cited and final within that time. *Infra*, pp. 23, 26 - 28.

### C.     Structure of the Mine Act

The structure of the Mine Act also shows that the regulation does not plainly include only violations that are cited and become final within 15 months. Consider the penalty process. After a citation is issued, MSHA proposes a penalty for that citation. Once a penalty is proposed, the operator can pay it, or can contest both the citation and the proposed penalty. 30 U.S.C. §815(a), (d). It takes up to another two-and-a-half months before a contest is docketed and Commission litigation commenced. *See* 30 U.S.C. §815(a), 29 C.F.R. §2700.28(a). Litigation then continues for years. At some later time, the penalty, the citation, and the

violation will become a final order of the Commission. 30 U.S.C. §§815(a),

823(d). Section 100.3(c) does not plainly address which of these many different

dates determine when a violation is to be included in an operator's history of

violations for purposes of assessing proposed penalties.

Or take, for example, GMS's hypothetical about a citation that was issued in

2018, contested, litigated, and resolved in 2021. GMS Br. 25. Those delays are

simply the inevitable result of contest litigation, which includes discovery,

hearings, post-hearing briefing, waiting for an ALJ decision, and potentially years

of appeals. *See* 30 U.S.C. §§823(d), 816; 29 C.F.R. §§2700.50-78 (Mine Act and

Commission provisions for hearings and appeals). GMS cannot be correct that the

regulation plainly means that an operator may use the inevitable delays of a

contest—even if that contest results in affirming the violation—to escape the

inclusion of that violation in its history. *See infra* pp. 35, 36 (discussing the

perverse incentives that GMS's interpretation would create).

Additionally, the date when the violation occurred is frequently not when the

citation of that violation is issued. Sometimes MSHA discovers violations and

issues citations on the same day. But some standards—like those that require

underground coal mine operators to apply rock dust to reduce the likelihood of

explosions in a coal mine from propagating into larger explosions, 30 C.F.R.

§§75.402-403—require MSHA to collect samples at a mine and send those

samples to a lab to be tested. If a sample result is noncompliant, MSHA will then issue a citation to the mine operator. Respirable dust sampling requirements, which aim to protect miners from lung disease, found at 30 C.F.R. Part 70, also involve a time lag between when a violation occurs and a citation for that violation is issued.

One of the most prominent situations where a citation is not issued at the time that a violation exists is in the case of accident investigations, which may last for months or years. For example, one of the deadliest mining accidents of recent history occurred at the Upper Big Branch mine on April 5, 2010. Twenty-nine miners were killed when a massive methane explosion ripped through the mine. MSHA did not complete its investigation and issue its findings in the form of a report until December 6, 2021. MSHA issued several contributory citations and orders dated December 6, 2021. *See* MSHA, Final Report – Fatality #3 through #31 – April 5, 2010, https://www.msha.gov/data-reports/fatality-reports/2010/fatality-3-through-31-april-5-2010/final-report. In that instance, although the accident and the violations occurred on April 5, 2010, the citations and orders were not issued until well more than 15 months later. That there is often a difference between the date of a violation and the issuance date of a citation also shows that §100.3(c), which discusses *violations*, does not plainly focus on a citation's issue date.

These structural aspects of the Mine Act all support the Secretary's decision not to read §100.3(c) to exclude many or most violations—especially the more serious violations—from an operator's violation history.

### D.    Purpose of the Mine Act and Section 100.3(c)

The purpose of the regulation is to carry out Congress's intent that an operator's history of violations be reflected in civil penalties assessed against it. The legislative history of the Act shows "that Congress was intent on assuring that the civil penalties provide an effective deterrent against all offenders, and particularly against offenders with records of past violations." *Coal Emp. Project v. Dole*, 889 F.2d 1127, 1133 (D.C. Cir. 1989), enforcement granted, 900 F.2d 367 (D.C. Cir. 1990). The regulation is designed to "provide the [Secretary] with sufficient data to accurately evaluate an operator's compliance record." 72 Fed. Reg. at 13,604.

The Secretary could have chosen to include all citations issued within the 15-month period, regardless of whether they were final or not, which would have ensured that only the most recent violations would have been included in the history calculation. The alternative to use only final orders posed a problem that valid violations issued within the 15-month period that did not become final before the end of the 15-month period would not be included in the operator's history of violations. The Secretary's solution was to include all violations that became final

24

orders within the 15-month period. The regulation and the Secretary's interpretation of it strike a careful balance between accurately reflecting the violations an operator has committed and ensuring "a measure of fairness by not including in an operator's history those violations that are in the adjudicatory process which may ultimately be dismissed or vacated." 72 Fed. Reg. at 13,604. GMS's interpretation would incentivize operators to ensure their recent violations did not become final orders within 15 months of being cited and would reduce or eliminate the number of actual violations counted.

GMS argues that the regulation was designed to capture an operator's recent violation history, so it cannot be interpreted to include citations issued outside the 15-month period. GMS Br. 25. But the preamble explains that recency is just one aspect of an "accurate evaluat[ion] of an operator's compliance record." 72 Fed Reg. at 13,604. Another crucial aspect is that *all* violations that become final are included in an operator's history, since those final violations are deemed to have actually occurred. *See id.* The regulation does not plainly exclude from consideration violations that actually occurred.

## III.   The Secretary's interpretation of Section 100.3(c) is reasonable.

The Secretary's interpretation of §100.3(c) is reasonable because it "come[s] within the zone of ambiguity" in the regulation and "fall[s] 'within the bounds of reasonable interpretation.'" *Kisor*, 139 S. Ct. at 2416 (quoting *Arlington v. FCC*,

25

569 U.S. 290, 296 (2013)). It is consistent with the text, history, and purpose of the regulation. *See supra*, pp 16 - 25. GMS's interpretation, in contrast, would lead to perverse incentives and purpose-defeating results. It would allow for valid violations to *never* be counted toward an operator's violation history and would encourage penalty contests simply to avoid violations being included in an operator's history of violations.

GMS's position would exclude from any consideration, ever, violations that were in fact committed. Consider this case: GMS has admitted that it committed the violations alleged in these five citations. When this litigation is concluded, those violations will be final. But if GMS's position is accepted, then these violations would never be included in its history of violations, ever, because the citations for these violations were all issued more than 15 months ago. The regulation should not be interpreted to allow operators to escape penalties that reflect their accurate history of violations.

GMS's interpretation also would functionally exclude from consideration the most serious violations, those involving fatal accidents, special assessments, knowing violations, and flagrant violations. As discussed, penalties for violations involving these special issues are often higher and more likely to be contested, and appealed, by operators. Take, for example, a recent Sixth Circuit case, *KenAmerican Resources v. Secretary of Labor*, 33 F.4th 884 (6th Cir. 2022).

26

MSHA cited the mine operator for providing prohibited advance notice of an inspection, 30 U.S.C. §813(a), and proposed a specially assessed penalty for the violation. That violation took more than 10 years to become final.

Or take a recent Eighth Circuit case, *Northshore Mining Company v. Secretary of Labor*, 46 F.4th 718 (8th Cir. 2022). That case arose from an accident where a dilapidated elevated walkway (that the operator knew was in serious disrepair) collapsed, causing a miner to fall and suffer serious injuries. The accident occurred on September 7, 2016; a citation and an order were issued on October 5, 2016;[2] MSHA proposed flagrant penalties for the cited violations, 30 U.S.C. §820(b)(2), and civil penalties against agents of the company, *id.* §820(c); and the operator and the agents contested them. The ALJ's decision was issued on February 13, 2019; both parties appealed, and the Commission issued its decision on January 21, 2021, more than 52 months after the citation and order were issued. Both parties appealed again, and the Eighth Circuit issued its decision on August 22, 2022, just a couple of weeks short of six years after the issuance of the citation and order. The Court held that the violation was a flagrant one, emphasizing the seriousness of the operator's and agents' conduct, and remanded the case back to the Commission for determination of an appropriate penalty.

---

[2] This information can be obtained from MSHA's Data Retrieval System at https://www.msha.gov/mine-data-retrieval-system. The Northshore Mine's Mine ID is 21-00831.

Under GMS's interpretation, none of these serious violations, including one deemed to be flagrant (the highest penalty the Secretary can assess for some of the most serious violations), would ever be included in the operator's violation history. Such an outcome is inconsistent with the purpose of the Act or Congress's intent that an operator's history of violations be included in that assessing proposed penalties.

GMS's interpretation of §100.3(c) also would lead to an absurd result because it would encourage contests of penalties simply to avoid violations being included in the operator's history of violations. Under GMS's interpretation, an operator can simply contest a citation or penalty in order to delay their becoming final beyond the 15-month period so that the violation is never included in the operator's violation history for penalty purposes. Considering the incentives created by various interpretations is crucial to determining which interpretations are reasonable. *Cf. Loc. Union 1261, Dist. 22, UMWA v. FMSHRC*, 917 F.2d 42, 46 (D.C. Cir. 1990) (discussing incentives created by various interpretations). An interpretation that encourages contests just to make violations fall off an operator's history is not a reasonable one.

## IV.    The Secretary's interpretation of §100.3(c) is entitled to deference.

This Court "need not rely on *Auer* deference where an agency's interpretation is the fairest reading of a regulation." *Tilden Mining Co., Inc. v.*

28

*Sec'y of Lab.*, 832 F.3d 317, 322 (D.C. Cir. 2016). For the reasons explained above, the Secretary's interpretation of this regulation is the fairest one. But if the Court believes deference is required, then the Secretary's interpretation merits it.

### A.    Authoritative or official position

"To apply *Auer* deference to an agency's reasonable reading of a genuinely ambiguous regulation, the regulatory interpretation must be one actually made by the agency; in other words, it must be the agency's authoritative or official position, rather than any more ad hoc statement not reflecting the agency's views." *Kisor*, 139 S. Ct. at 2414. The preamble to Part 100 is about as authoritative a source as any because it was promulgated in conjunction with the rule, constitutes the official position of the Secretary, and was published in the Federal Register contemporaneously with the rule. *See Doe*, 28 F.4th at 1314 (there is no dispute that the SEC's interpretation published in the Federal Register is an official agency policy). Likewise, MSHA's Program Policy Manual also makes this procedure clear. PPM 97. The Program Policy Manual is "the official repository of the Secretary's interpretation of the regulations," *Jim Walter Res.*, 103 F.3d at 1024, and the interpretation included in it represents the Secretary's official position.

### B.    Substantive expertise

"The agency's interpretation must in some way implicate its substantive expertise." *Kisor*, 139 S. Ct. at 2417. The meaning of the term "substantive expertise" is not specifically explained in *Kisor*; however, the Court explained that "[a]dministrative knowledge and experience largely 'account for the presumption that Congress delegates interpretive lawmaking power to the agency.'" *Ibid.* (citing *Martin v. OSHRC*, 499 U.S. 144, 153 (1991)) (cleaned up). Substantive expertise is not limited to technical or "mining experience" expertise as argued by GMS. GMS Br. 40-41. Proposing a civil penalty involves substantive expertise about the incentives needed to promote mine safety and health compliance.

This Court has already rejected a rationale much like GMS's. In *Doe v. SEC*, the Court considered whether the SEC's interpretation of a whistleblower provision deserved deference. 28 F.4th at 1315. The Court acknowledged that deference may be inappropriate if the subject matter is very different from an agency's normal duties, but *is* appropriate if the "subject matter . . . is part and parcel of the [agency's] statutorily assigned duties" and if Congress has "explicitly entrusted the [agency] with implementation and oversight of the program." *Id.* That is precisely the case here. True, proposing penalties may not be "rocket science," but "[a]gencies can and frequently do . . . possess expertise in fields of varying complexity, including in those less convoluted than 'rocket science.'" *Id.* And as

30

MSHA's extensive discussion of various factors it balanced when promulgating this regulation shows, deciding how to calculate proposed penalties "undoubtedly implicates its 'policy expertise.'" *Id.* (quoting *Kisor*, 139 S. Ct. at 2417); *see* 72 Fed. Reg. at 13,603-04 (discussing these factors).

### C.    Fair and considered judgment

"An agency's reading of a rule must reflect fair and considered judgment to receive *Auer* deference." *Kisor*, 139 S. Ct. at 2417. The Secretary's interpretation of §100.3(c) is not a new interpretation and does not create unfair surprise. The Secretary's interpretation has been consistent since the Part 100 rule was promulgated in 2007. *See* 72 Fed. Reg. at 13,604. The regulated community, including GMS, has been well-aware of that interpretation since that time through the above referenced language in the preamble, through the Program Policy Manual, and through consistent application of that interpretation.

### D.    Agency intent

The *Kisor* Court reiterated that the *Auer* deference doctrine was concerned with implementing the agency's intent of an ambiguous regulation. "The agency that 'wrote the regulation' will often have direct insight into what that rule was intended to mean." *Kisor*, 139 S. Ct. at 2412 (citing *Mullins Coal Co. of Va. V. Director, Office of Workers' Compensation Programs*, 484 U.S. 135, 159 (1987)).

31

In this case, the Secretary's intent is clearly articulated in the preamble, which was promulgated simultaneously with the rule, in the Program Policy Manual, and through consistent application of that interpretation in practice. GMS is asking this Court to disregard the agency's plainly stated intent and substitute that intent with the company's self-serving interpretation to reduce their civil penalties in this case and in future cases. Such an outcome is not what Congress intended when it passed the Mine Act and not what the Supreme Court intended in *Kisor*. For the reasons detailed above, MSHA's reasonable interpretation of §100.3(c) satisfies the criteria articulated by the Court in *Kisor*.

## V.    The ALJ committed no material factual errors.

GMS raises several other challenges to the ALJ's decision based on alleged factual mistakes. These challenges are frivolous.

GMS takes issue with the ALJ's statement that "[t]here is no disagreement that citations and orders that have become final in the 15-month period are included," complaining that this is not what it stipulated to and that the ALJ misrepresented its position. GMS Br. 41-42. The ALJ was simply stating that in practice MSHA includes violations in the history calculation as they become final, and that GMS does not dispute that that is how MSHA makes its calculations. (See Stipulation 17). That the ALJ fully understood GMS's position is made quite clear

32

by the very next sentence in his decision, which GMS completely ignores in its argument: "However, the Respondent argues that in order to count towards the operator's history, the violation must have both occurred and been paid, adjudicated, or have become a final order of the Commission during the 15-month period." ALJD 5 (JA ___). GMS's argument that the ALJ misstated or misunderstood its position is inaccurate and should be disregarded.

GMS further argues the ALJ had no facts to support his finding that "[u]nder the Respondent's interpretation of the regulation, most (if not all) violations would not be considered in the penalty assessment. This is due to the fact that when an operator contests a citation or order, it rarely becomes final within 15 months." GMS Br. 42 (quoting ALJD 6).

But in the Secretary's motion for summary decision before the ALJ, the Secretary referred to the ten then-most-recent ALJ decisions issued after hearing in contested cases[3] and pointed out that, as of when the parties filed their motions for summary decision, *all* took more than 15 months to be issued from when the violations were cited. They took between 17 months and 8 years. JA ___. Contrary to GMS's argument, these are not just "anecdotal" decisions. GMS Br. 42-43. Rather, they demonstrate that violations that go through the full contest process are

---

[3] Procedural orders, orders addressing other-than-penalty cases, such as discrimination cases, and orders addressing settlements were not included.

unlikely to—and in cases that are appealed, virtually guaranteed not to—become final within 15 months from when the citations are issued. In fact, in all but one of the Mine Act cases GMS cites in its brief, the violations did not become final for more than 15 months after the citations were issued, some for more than 5 years.[4]

GMS cites a Commission budget plan to dispute the fact that contested citations and orders are frequently not finalized for more than 15 months. GMS Br. 43-44. GMS did not present this to the ALJ. *See* Motion for Summary Decision (JA ___). And in any event, GMS's reference to the Commission's budget plan noting that the normal time to resolve a contested case is 180 days and that "only" 20% of contested cases are on hand after one year is misleading. It is misleading because, first, most contested cases are settled and will resolve much faster than cases that are fully litigated. (Which may change if GMS's view of violation history prevails.) By the time parties go through discovery, motions practice, hearing preparation, the hearing, the filing of briefs, and the issuance of a written decision, fully litigated cases are likely not to be resolved within 15 months. That does not take into account the appellate process for those cases that are appealed to the Commission and possibly the courts of appeals.

---

[4] The one exception is *Hobet Mining Co*., 26 FMSHRC 890 (Nov. 2004) (ALJ), which was decided on cross-motions for summary decision.

GMS's reference to the Commission's plan is also misleading because it does not account for the time period from when a citation is issued and when the proposed penalty is filed with the Commission. It takes months (or longer) for MSHA to propose a penalty, plus another two-and-a-half months before a contest is docketed and Commission litigation commenced. *See* 30 U.S.C. §815(a), 29 C.F.R. §2700.28(a). So the one-year period for resolution of cases referenced in the Commission's budget plan would bring the final resolution beyond 15 months. Plus, the 20% of cases that are not resolved within one year is a significant percentage of cases and most likely represents more serious violations that are all the more important to include in an operator's history. Thus, GMS's reference to the Commission's budget plan actually shows that a significant number of violations do not become final orders of the Commission within fifteen months and, under GMS's interpretation of §100.3(c), would never be counted towards operators' history of violations. Plus, if GMS's interpretation were accepted, operators would be incentivized to contest more cases, which would slow things down even more.

Finally, GMS argues that the ALJ erred in finding that GMS's interpretation of §100.3(c) would provide a perverse incentive for operators to contest penalty assessments. GMS Br. 44-46. The ALJ simply recognized the obvious result of GMS's interpretation of §100.3(c) that it would provide an incentive for operators

to contest proposed penalty assessments because that would reduce future penalties for future violations by prolonging the finality of the violations being contested. Considering the consequences of an interpretation is not a factual error, it is a proper legal consideration. *Cf. UMWA v. FMSHRC*, 917 F.2d at 46 (discussing incentives created by various interpretations). That is not to say, as GMS implies, that the Secretary argues or the ALJ found, that certain operators will contest a certain number of penalty assessments for that reason. Such a precise outcome is unknowable. However, it is simple common sense to recognize that application of GMS's interpretation of §100.3(c) would provide such an incentive.

The irony of GMS's argument on this point is blatantly obvious. GMS admitted that it committed all the violations alleged in the citations in this case. The only reason that GMS has contested this matter, and the five violations involved, is precisely and solely to reduce the penalties for those citations and future citations and orders based on how the history of violations criterion is counted.

**CONCLUSION**

Section 100.3(c) is ambiguous on the question of whether a violation must occur or be cited in the 15-month period to be included in an operator's history of violations. The Secretary's interpretation of the regulation and answer to that question is that a violation is included as of when it becomes a

36

final order of the Commission, notwithstanding when it occurred or was cited. This position has consistently been articulated in official agency documents. The Secretary's interpretation is reasonable and entitled to deference. On the other hand, GMS's interpretation is not a reasonable one and would lead to absurd results. For these reasons and as stated above, the Secretary respectfully requests that the Court deny GMS's petition for review.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

*/s/Robert S. Wilson*
Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202-5450
Telephone: 202.693.9389
Fax: 202.693.9361
E-mail: wilson.robert.s@dol.gov
Attorneys for the Secretary of Labor

**Certificate of Compliance with Type-Volume Limit, Typeface requirements, and Type-Style Requirements**

I certify that this brief complies with the type-volume of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 8,450 words.

In addition, this brief complies with the typeface and type-style requirements of Fed. R. App. P. 27 (d)(1)(E) because it has been prepared in Microsoft Word in 14-point Times New Roman.

# Certificate of Service

This will certify that I, Robert S. Wilson, electronically filed the

foregoing with the Clerk of Court for the United States Court of Appeals for

the D.C. Circuit by using the appellate CM/ECF Electronic Filing System on

November 30, 2022. I certify that all participants in this case are registered

CM/ECF users, and that service will be accomplished by the appellate

CM/ECF system.

> Jason Riley, Esq.
> Office of General Counsel
> Federal Mine Safety & Health Review Commission 1331
> Pennsylvania Avenue, NW, Suite 520 N Washington, D.C. 20004
>
> James P. McHugh
> Christopher D. Pence
> HARDY PENCE, PLLC
> 10 Hale Street, 4th Floor
> Charleston, WV 25301

> > */s/Robert S. Wilson*
> > Attorney
> > U.S. Department of Labor

## Addendum – Pertinent Regulation

**30 C.F.R. §100.3(c)**

***History of previous violations.*** An operator's history of previous violations is based on both the total number of violations and the number of repeat violations of the same citable provision of a standard in a preceding 15-month period. Only assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission will be included in determining an operator's history. The repeat aspect of the history criterion in paragraph (c)(2) of this section applies only after an operator has received 10 violations or an independent contractor operator has received 6 violations.

(1) Total number of violations. For mine operators, penalty points are assigned on the basis of the number of violations per inspection day (VPID) (Table VI). Penalty points are not assigned for mines with fewer than 10 violations in the specified history period. For independent contractors, penalty points are assigned on the basis of the total number of violations at all mines (Table VII). This aspect of the history criterion accounts for a maximum of 25 penalty points.

(2) Repeat violations of the same standard. Repeat violation history is based on the number of violations of the same citable provision of a standard in a preceding 15-month period. For coal and metal and nonmetal mine operators with a minimum of six repeat violations, penalty points are assigned on the basis of the number of repeat violations per inspection day (RPID) (Table VIII). For independent contractors, penalty points are assigned on the basis of the number of violations at all mines (Table IX). This aspect of the history criterion accounts for a maximum of 20 penalty points (Table VIII).